CRITCHLEY, KINUM & VAZQUEZ, LLC
ATTORNEYS AT LAW
75 LIVINGSTON AVENUE
ROSELAND, NEW JERSEY 07068

MICHAEL CRITCHLEY
MICHAEL CRITCHLEY, JR.
CHRISTOPHER W. KINUM
JOHN MICHAEL VAZQUEZ

EDMUND DENOIA
CHRISTOPHER L. FOX

(973) 422-9200

FAX: (973) 422-9700
web site: www.critchleylaw.com

May 27, 2015

***Electronically Filed***

Honorable Susan D. Wigenton, U.S.D.J.
M.L. King, Jr. Federal Building & Courthouse
50 Walnut Street
Newark, New Jersey 07102

***Re:*** ***United States v. Baroni, et. al., Indictment No.: 15-cr-00193 (SDW)***

Dear Judge Wigenton:

This firm represents Bridget Anne Kelly in the above referenced matter. I am writing on behalf of Ms. Kelly, and joined by defendant William Baroni, to respectfully request that the court issue a Rule 17(c) subpoena for documents and information material to defendants' defense. Specifically, defendants seek a Rule 17(c) subpoena for, among other things set forth below, rough and/or draft handwritten and typed notes of interviews[1] conducted by the law firm Gibson, Dunn & Crutcher, LLP ("Gibson Dunn") related to the subject matter of the Indictment.

I. Background

Federal Rule of Criminal Procedure 17(c) provides for the use of subpoenas in criminal matters, by either a defendant or the government, to obtain documentary evidence as follows:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The

[1] Defendants' request also includes transcripts and audio and/or video recordings of any interviews.

> court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

R. 17(c). The issuance of a Rule 17(c) subpoena is left to the sound discretion of the district court. See United States v. Nixon, 418 U.S. 683, 702 (1974). "The test for enforcement [of a Rule 17 subpoena] is whether the subpoena constitutes a good faith effort to obtain identified evidence rather than a general 'fishing expedition' that attempts to use the rule as a discovery device." United States v. Cuthbertson, 630 F.2d 139, 144 (citations omitted); see also United States v. Vanegas, 112 F.R.D. 235, 238 (D.N.J. 1986).

When a defendant makes an application for a Rule 17(c) subpoena on a third party, the subpoena must be "(1) reasonable, construed using the general discovery notion of 'material to the defense;' and (2) not unduly oppressive for the producing party to respond." United States v. Nachamie, 91 F. Supp. 2d 552, 563 (S.D.N.Y. 2000); see also United States v. Tucker, 249 F.R.D. 58, 66 (S.D.N.Y. 2008), as amended (Feb. 20, 2008); United States v. Tomison, 969 F. Supp. 587, 593 (E.D. Cal. 1997) ("[W]here evidence relevant to guilt or punishment is in a third party's possession and is too massive for the defendant to adequately review unless obtained prior to trial, pre–trial production through Rule 17(c) is necessary to preserve the defendant's constitutional right to obtain and effectively use such evidence at trial." (citing United States v. Murray, 297 F.2d 812, 821 (2d Cir. 1962) (interpreting Bowman Dairy Co. v. United States, 341 U.S. 214 (1951))).

By way of background, on or about January 9, 2014, the USAO announced that it had launched an investigation into to the events which give rise to the present Indictment. See May 27, 2015, Declaration of Michael Critchley, Esq ("Critchley Dec."), Ex. 1. On January 16, 2014, Gibson Dunn was retained by the Office of the Governor of New Jersey to conduct what was later

described as a "thorough and exhaustive" investigation into events which give rise to the present Indictment. Specifically, Gibson Dunn was retained to "conduct an internal investigation of the George Washington Bridge" allegations and "facilitate cooperation with the U.S. Attorney's Office." Critchley Dec., Ex. 2 at 35. Governor Christie made clear that he "would make [Gibson Dunn's investigation] public without any restriction." Critchley Dec., Ex. 3. On or before February 3, 2014, the Office of the Governor received a subpoena from the USAO related to the subject matter of this Indictment. Critchley Dec., Ex. 2 at 34 n.203.

Gibson Dunn conducted more than 70 interviews over the course of approximately two months in early 2014 and reviewed over 250,000 documents in order to produce a 300-plus page investigative report (the "Mastro Report"). Critchley Dec., Ex. 2 at 1, 36. On or about March 27, 2014, Gibson Dunn publically disclosed the Mastro report, hundreds of carefully selected exhibits, and later disclosed interview summaries of the witnesses interviewed, on a public website maintained by Gibson Dunn.[2] Critchley Dec., Ex. 4. Gibson Dunn also produced the Mastro Report and witness interview summaries to the USAO and the New Jersey Legislative Select Committee on Investigations.[3] Recent media reports indicate that, to date, the State of New Jersey has paid Gibson Dunn over $7,750,000 for this matter. Critchley Dec., Ex. 5.

Following defendants' initial appearance, counsel met and conferred with the USAO to discuss discovery generally, and to discuss documents produced by Gibson Dunn specifically. During the meet and confer, the government indicated that it intends to produce approximately 1.5

---

[2] The Mastro Report and exhibits and the interview summaries were publically available at www.gdcreport.com. This website has apparently been disabled.

[3] The Committee is a bi-partisan joint legislative investigative committee comprised of eight Assembly representatives and four Senators. The Committee possesses the legislative subpoena power, which it has used to compel testimony before it and the production of documents. The Committee, while having the power to investigate other matters, has primarily focused its investigation on the events and subject matter that give rise to this Indictment.

million pages of documents in discovery. Additionally, the USAO indicated that Gibson Dunn had produced to the government the Mastro Report and interview summaries that Gibson Dunn had also made publicly available via the website controlled by Gibson Dunn. The USAO further indicated that they had asked Gibson Dunn for copies of the rough or draft notes from which the interview summaries were prepared and were told that none existed.

Gibson Dunn's apparent representation to the USAO that it did not have or retain notes of interviews that were conducted during Gibson Dunn's "investigation," despite the existence of an ongoing federal Grand Jury investigation and a specific subpoena to the Governor's Office for information related to the reduction of lanes at the George Washington Bridge, is troublesome to say the least. Considering the number of former assistant U.S. attorneys described as "Key Members of Gibson Dunn's Investigation Team," Gibson Dunn was keenly aware of its affirmative obligation to retain, and not alter or destroy, any and all information in its possession related to an ongoing Grand Jury investigation and responsive to a Grand Jury Subpoena of its client.

Separately, Gibson Dunn was under a specific obligation to retain all "work product" created during its engagement by the Office of the Attorney General on behalf of the Office of the Governor. Specifically, the "Outside Counsel Guidelines" maintained by the Office of the Attorney General and Department of Law states: "Outside counsel shall retain . . . work product . . . for a period of not less than seven (7) years from the date the matter is concluded or for the time period specified by rule or law in the jurisdiction in which the matter was pending, whichever is longer." <u>See</u> Critchley Dec., Ex. 6 at 15. Thus, the very terms of Gibson Dunn's engagement required it to retain its rough and/or draft interview notes, stenographic transcripts and audio and video recordings of interviews for at least seven years.

Defendants respectfully request that the court issue a Rule 17(c) subpoena to obtain the actual rough and/or draft notes (whether handwritten or typed)[4] used to prepare the interview summaries that have been publically disclosed, as well as the other information detailed below. Counsel has been advised by several individuals who attended the Gibson Dunn interviews that an attorney, paralegal and/or stenographer was "feverishly" typing verbatim or near verbatim notes of everything that was said by the witnesses during the interviews.[5] Critchley Dec., ¶ 12. Unless Gibson Dunn inexplicably destroyed or discarded all the device(s) and notepads used by the attorneys, paralegal and/or stenographer, Gibson Dunn must possess notes of the interviews in either handwritten or typed form, notwithstanding its apparent representations to the Government.

The interview rough notes, as opposed to the interview summaries, are highly material to the defendants because they contain potential trial witnesses' actual, contemporaneous recitations of the facts related to the present Indictment. The interview summaries, on the other hand, state that each witness "has not read or reviewed the memorandum and has not adopted or approved its contents." See Critchley Dec., Ex. 7. Additionally, the summaries state "[t]his memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions . . . ." Id. As such, the reliability of the interview summaries are wholly dependent on "counsel's mental thoughts and impressions." Id.

Not surprisingly, considering the questionable manner in which the interview summaries were prepared, two witnesses have already stated under oath during legislative hearings that the

[4] Defendants' request includes any stenographic transcripts and audio and/or video recordings.
[5] It is counsel's understanding that, in addition to a paralegal and/or stenographer, attorneys were also separately taking notes during the interviews. Further, the interviews must have been memorialized in rough or draft form in order to prepare the interview summaries that were publically disclosed.

summaries were incorrect in critical respects. Specifically, Christine Genovese Renna, a former colleague of Ms. Kelly's whom defendants anticipate will be a witness at trial, stated that the summaries contained "some inaccuracies" and characterized her interview summary as "alarming" because it contained "aggressive language . . . not language that [she] would have used." Critchley Dec., Ex. 8, T:40–42, 51. Similarly, Kevin O'Dowd, former Chief of Staff to Governor Christie, and Ms. Kelly's former direct supervisor whom the defendants also believe will be a witness at trial, took exception with the characterizations of Ms. Kelly in his interview summary. Critchley Dec., Ex. 9, T:143, 222–224.

Muddying the waters even further, many witnesses were interviewed by as many as six attorneys[6] on multiple days over the course of two months.[7] Critchley Dec., Ex. 7. Despite the multiple interviews, Gibson Dunn prepared only one summary for each witness that was authored generally by "Gibson, Dunn & Crutcher, LLP," not a specific attorney. Id. Therefore, without the attorney rough notes or the notes of the individual(s) "feverishly" typing what was said during the interviews, it is impossible to determine: which attorney's recollection is captured in each witness's summary; what was discussed with the witnesses during separate interviews; or, how the witnesses' recollections may have changed from one interview to the next. The handwritten or typewritten interview notes are the only means of determining what the witnesses actually said.

---

[6] As a separate matter, Gibson Dunn's use of as many as six attorneys to conduct routine witness interviews is a blatant violation of the Attorney General's and Division of Law's "Outside Counsel Guidelines," which states: "The Division expects lean staffing on its matters. The Division generally expects to be billed for only one attorney to attend events such as depositions, [and] witness meetings . . . ." See Critchley Dec., Ex. 6 at 7. While the Guidelines recognize that in more "complex matters . . . it may *occasionally* be appropriate for multiple attorneys to attend *significant events* . . . [the Division] insist[s], however, no more than the minimum number of attorneys necessary to an event attend." Id. (emphasis added). As such, Gibson Dunn's overstaffing and underperforming in failing to turn over its rough notes as requested by the USAO is beyond puzzling.

[7] By way of illustration, Ex. 7, Table 1, details the witnesses that were interviewed on more than one occasion and/or interviewed by 3 or more attorneys. See Critchley Dec., Ex. 7, Table 1.

I. Discussion

As a preliminary matter, it is well-established that attorney interview notes reflecting factual statements by witnesses are not opinion work product and are thus discoverable. See *In re* John Doe Corp., 675 F.2d 482 (2d Cir. 1982). In John Doe Corp., the government sought the production of attorney notes of interviews of plaintiff's employees in connection with an investigation. The Second Circuit observed after examining the notes of one of employee:

> their production will not trench upon any substantial interest protected by the work-product immunity. The notes recite in a paraphrased, abbreviated form, statements by Employee A relating to events surrounding the payment to Lawyer. ***To the extent that the statements imply the attorney's questions from which inferences might be drawn as to his thinking, those inferences merely disclose the concerns a layman would have as well as a lawyer in these particular circumstances, and in no way reveal anything worthy of the description 'legal theory.'*** We hold, therefore, that the notes of the Employee A interview must be produced.

[Id. at 493 (emphasis added).]

As such, the facts contained in the interview notes are not privileged. The Mastro Report makes clear that the purpose and scope of Gibson Dunn's retention was, among other things, to perform "a thorough investigation of the *facts* relating to [] the George Washington Bridge lane realignment . . . ." Critchley Dec., Ex. 2 at 36 (emphasis added). Since Gibson Dunn, by its own admission, was retained to simply gather facts, the interview rough notes are not privileged.

To the extent that any part of the Gibson Dunn attorney notes could have been considered privileged, Gibson Dunn waived any potential privilege by selectively disclosing the interview summaries and Mastro Report to the USAO, the New Jersey Legislative Select Committee on Investigations and also posting the material on a public website controlled by Gibson Dunn during

an ongoing Grand Jury investigation in which its client was subpoenaed to, at least, produce documents.[8] "[T]he Supreme Court has rejected attempts to use 'the work-product doctrine to sustain a unilateral testimonial use of work-product materials.' [And w]e have previously denied a claim of privilege after a claimant decided to selectively disclose confidential materials in order to achieve other beneficial purposes." *In re* Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993) (quoting United States v. Nobles, 422 U.S. 225, 240 (1975)). The Steinhardt court opined that "selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage," and observed that those waiving such protections generally do not do so for altruistic reasons: "[v]oluntary disclosure is generally made because [of the belief] that there is some benefit to be gained from disclosure." Id. at 235.

A party, therefore, waives the protections afforded by the work product doctrine when they disclose privileged information to a government agency during the course of an investigation. *See* Westinghouse v. Republic of the Philippines, 951 F.2d 1414 (3d Cir. 1991) (declining to adopt selective waiver for work product privilege and holding that voluntary disclosure to the SEC and DOJ waived work product protection, despite existence of confidentiality agreement with the DOJ and reliance on the SEC's regulations concerning confidentiality); see also *In re* Qwest Comm'n Int'l, Inc., 450 F.3d 1179 (10th Cir. 2006) (rejecting selective waiver and holding disclosure waived work product privilege); *In re* Colubmia/HCA Healthcare Corp., 293 F.3d 289 (6th Cir. 2002) (same); United States v. Mass. Inst. of Tech., 129 F.3d 681 (1st Cir. 1997) (same); *In re* Steinhardt, 9 F.3d 230 (2d Cir. 1993) (same).

---

[8] Media reports indicate that Governor Christie was interviewed by the USAO in or about December 2014. Critchley Dec., Ex. 10.

Setting aside that the Gibson Dunn investigation was financed with millions of dollars in public funds, and ostensibly in "the best interest of the State,"[9] the investigation, from the start, was intended to be revealed publicly "without any restriction" and not limited to selectively chosen facts that purport to support the investigation's conclusions. Clearly, Gibson Dunn reaped the strategic advantage it sought by selectively disclosing particular information to the public and holding a televised press conference to release its findings. As such, Gibson Dunn, and/or the Governor's Office, clearly waived any privilege that may have applied to the materials created during its investigation.

Moreover, Gibson Dunn, in particular, was on notice that its interview notes were discoverable once Gibson Dunn voluntarily produced the Mastro Report, selected exhibits and interview summaries to the USAO and New Jersey Legislative Select Committee on Investigations, as well as posting the same online for the whole world to access. See Gruss v. Zwirn, 296 F.R.D. 224 (S.D.N.Y. 2013). Gruss involved litigation arising out of an internal investigation conducted by Gibson Dunn. Gibson Dunn was ordered to produce its attorneys' notes and summaries of twenty-one witnesses it interviewed during the internal investigation after disclosing summaries of the witnesses' interviews in a PowerPoint presentation to the SEC. Id. at 226–27.

The plaintiff in Gruss sought disclosure of the factual portions of the interview notes and summaries reflecting the witnesses' statements, not the portion of the notes and summaries

[9] It is unclear under what authority the Acting Attorney General authorized Gibson Dunn to perform an internal investigation for the Office of the Governor, which was not requested by any law enforcement agency or any other party. The purely voluntary internal investigation was certainly not an "action" under N.J.S.A. 59:10A-1, which only provides for a defense in civil actions seeking tort damages. Presumably, the Acting Attorney General concluded that the internal investigation somehow constituted a "proceeding" under N.J.S.A. 10A-3 which affords the Attorney General with the discretion to provide a "defense" only if "it is in the best interest of the State."

containing the attorneys' opinions or analytical processes. Id. at 227. Gibson Dunn opposed such disclosure by asserting the attorney-client and work product privileges. Id. Gibson Dunn's assertion that "the interview notes constitute, in their entirety, core opinion work product" was roundly rejected by the court, which found "Gibson Dunn's representation . . . not credible." Id. at 230–31. The Gruss court noted that by Gibson Dunn "choosing to produce in discovery the presumably favorable witness interview excerpts shown to the SEC—while refusing to produce the witness summaries and notes from which the favorable excerpts were drawn—Defendants have manipulated their evidentiary privileges to serve their interests." Gruss v. Zwirn, No. 09-CV-644, 2013 WL 3481350, at *11 (S.D.N.Y. July 10, 2013), aff'd, 296 F.R.D. 224 (S.D.N.Y. 2013). The Gruss court held, therefore, that by giving the PowerPoint presentation to the SEC and producing same in discovery, Gibson Dunn forfeited "any work product protection associated with the factual portions of the interview notes and summaries." Id. at *13.

Here, by selectively and voluntarily disclosing the Mastro Report, selected exhibits and purported summaries of the witnesses' statements to the USAO,[10] New Jersey Legislative Select Committee on Investigations and the public, Gibson Dunn has similarly forfeited any and all work product protections associated with the factual portions of its rough and draft interview notes and summaries. Defendants here, like the plaintiff in Gruss, are seeking the *facts* contained in the rough and draft interview notes and summaries. The mechanical function of transcribing what a witness says in an interview does not in any way reveal counsels' opinions or analytical processes.[11] Attorney rough interview notes reflect nothing more than a factual recitation of the

---

[10] In addition to producing the Mastro Report and interview summaries, Gibson Dunn also "periodically briefed the U.S. Attorney's Office on [its] findings as [its] review progressed." Critchley Dec., Ex. 2 at 36.

[11] The Mastro Report makes clear that the purpose and scope of Gibson Dunn's retention was, among other things, to perform "a thorough investigation of the *facts* relating to []the George Washington Bridge lane realignment . . . ." Critchley Dec., Ex. 2 at 36 (emphasis added).

subject matter of the investigation. Therefore, Ms. Kelly respectfully requests that the court issue a Rule 17(c) subpoena for Gibson Dunn to produce its rough and draft interview notes and summaries.

If Gibson Dunn asserts the same position it unsuccessfully took in Gruss, that all its factual rough and draft notes constitute opinion work product, defendants respectfully request that the court adopt the same procedure as Judge Gardephe in Gruss and order Gibson Dunn to provide the court *those portions* of notes that Gibson Dunn considers to be opinion work product for an *in camera* review.

If Gibson Dunn represents that it destroyed any of its attorney rough or draft interview notes, typed notes or stenographic transcripts prepared by its paralegal/stenographer, or audio or video recordings, defendants respectfully request that the court hold a hearing to determine when the notes were destroyed, why they were destroyed and at whose instruction. Knowingly destroying documents or information that may be relevant and material to an ongoing Grand Jury investigation is, at the very least, highly inappropriate. Moreover, such conduct calls into question the information that was obtained during the course of its investigation, which may be material to defendants' defense.

The Third Circuit has "unequivocally required since 1977 that government agents preserve rough notes of interviews with prospective trial witnesses." United States v. Ramos, 27 F.3d 65, 66 (3d Cir. 1994) (citing United States v. Vella, 563 F.2d 275 (3d Cir. 1977)). While Gibson Dunn's attorneys are not government agents,[12] the rationale for the Third Circuit's explicit and unambiguous mandate that rough interview notes be preserved is equally applicable here:

[12] It should be noted, however, that the "Key Members Of Gibson Dunn's Investigation Team" are touted as "five former federal prosecutors with distinguished careers in public service." Critchley Dec., Ex. 2 at 39–41.

> It seems too plain for argument that rough notes from any witness interview could prove to be [] material. . . . [T]he notes could contain substantive information or leads which would be of use to the defendants on the merits of the case. If the witness does testify, the notes might reveal a discrepancy between his testimony on the stand and his story at a time when the events were fresh in his mind. The discrepancy would obviously be important to use in impeaching the witness'[s] credibility. The possible importance of the rough notes for these purposes is not diminished in cases where . . . the defense [receives] the reports. The . . . reports contain the [attorney's] narrative account of the witness's statement, prepared partly from the rough notes and partly from the [attorney's] recollection of the interview. Although the [attorneys] are trained to include all the pertinent information in the . . . report, there is clearly room for misunderstanding or outright error whenever there is a transfer of information in this manner. In the best of good faith, the statement . . . may, to some degree at least, reflect the input of the [attorney]. ***In such a situation, the information contained in the rough notes taken from the witness himself might be more credible and more favorable to the defendant's position.***

[Ramos, 27 F.3d at 70 (emphasis added) (quoting United States v. Harrison, 524 F.2d 421, 427–28 (D.C. Cir. 1975)].

In addition to the rough and draft interview notes (handwritten or typed) and recordings, defendants also respectfully request that the court issue a Rule 17(c) subpoena for the metadata and/or properties of the interview summaries and typed interview notes. As stated above, the interview summaries do not identify which, of as many of six, attorneys actually prepared each witness summary. The metadata and/or properties is highly material because it will identify who created the summaries, who, if anyone, edited the summaries, and when. Therefore, if a dispute arises at trial, as it did during related legislative hearings, as to the content of the summaries or notes, the defense will be able to identify which Gibson Dunn attorney prepared the document in question in order to call the attorney as a witness.

It is critical that defendants obtain the information sought in the Rule 17(c) subpoena as soon as possible. The rough handwritten and typed notes and summaries of the interviews Gibson

Dunn conducted, together with the 1.5 million pages other pages of discovery, are so voluminous it is necessary for defendants to immediately obtain them in order to effectively prepare for trial. Without the prompt receipt of the above materials, defendants' trial could be delayed and defendants would be denied their constitutional right to effective aid in the preparation and trial of their case. Moreover, production of the information is not a hardship on Gibson Dunn because they are simply being asked to produce information which they should have readily available and information for which the taxpayers of New Jersey have paid $7,750,000 to compile.

Respectfully submitted,

s/ Michael Critchley
MICHAEL CRITCHLEY

MC:mc
Enc.

cc: Vikas Khanna, A.U.S.A. (Via ECF)
Michael Baldassare, Esq. (Via ECF)