Michael Critchley, Esq.
**CRITCHLEY, KINUM & VAZQUEZ, LLC**
75 Livingston Avenue, 3rd Floor
Roseland, New Jersey 07068
(973) 422-9200
(973) 422-9700 fax
*Attorneys for Defendant Bridget Anne Kelly*

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**WILLIAM BARONI, et. al.,**<br><br>**Defendants.** | **HON. SUSAN D. WIGENTON, U.S.D.J.**<br><br>**Case No. 15-193 (SDW)**<br><br><u>**DECLARATION OF**</u><br><u>**MICHAEL CRITCHLEY, ESQ.**</u> |

MICHAEL CRITCHLEY, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am an attorney duly licensed to practice law in the State of New Jersey and am a partner with the law firm Critchley, Kinum & Vazquez, LLC, counsel for Bridget Anne Kelly. This Declaration is based upon my personal knowledge.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a January 9, 2015 Bloomberg News article titled *Christie Bridge Traffic Scandal Probed by Prosecutors*.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from *Report of Gibson, Dunn & Crutcher LLP Concerning Its Investigation on Behalf of the Governor of New Jersey into Allegations Regarding The George Washington Bridge Lane Realignment and Superstorm Sandy Aid to the City of Hoboken* (the "Mastro Report").

4.      Attached hereto as Exhibit 3 is a true and correct copy of a March 27, 2014 New Jersey 101.5 article titled *Christie Bridgegate Probe Blames Wildstein, Kelly*.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a March 27, 2014 NY Times Article titled *Report Details Claim by all: Christie knew of Bridge Lane Closings*.

6.      Attached hereto as Exhibit 5 is a true and correct copy of May 13, 2015 NJ.com Article titled *Christie Bridgegate legal tab rises to $7.75 Million*.

7.      Attached hereto as Exhibit 6 is a true and correct copy of The Attorney General and Department of Law "Outside Counsel Guidelines."

8.      Attached hereto as Exhibit 7 is true and correct copy of excerpts of interview summaries prepared by Gibson Dunn.

9.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts of the May 6, 2014 sworn testimony of Christine Genovese Renna before the New Jersey Legislative Select Committee on Investigations.

10.     Attached hereto is Exhibit 9 is a true and correct copy of the June 9, 2014 sworn testimony of Kevin O'Dowd before the New Jersey Legislative Select Committee on Investigations.

11.     Attached hereto as Exhibit 10 is a true and correct copy of an ABC article titled *Chris Christie Was Interrogated By Feds Over Bridge Scandal*.

12.     I was advised by individuals who attended the interviews conducted by Gibson Dunn that a person present during the interviews was "feverishly" taking verbatim or near verbatim notes of everything the witnesses stated during the interview.  It was unclear to the individuals who attended the interviews whether the person who was "feverishly" typing was a paralegal or a stenographer.

13.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

s/ Michael Critchley
MICHAEL CRITCHLEY, ESQ.

Dated:  May 27, 2015

# EXHIBIT 1

# BloombergBusiness

# Christie Bridge Traffic Scandal Probed by Prosecutors

by David Voreacos
2:57 PM EST January 9, 2014



Traffic moves over the Hudson River and across the George
Washington Bridge between New York City, right, and in Fort Lee,
New Jersey. Photographer: John Moore/Getty Images

Jan. 9 (Bloomberg) -- Federal prosecutors in New Jersey opened a probe into the scandal prompted when aides to Governor Chris Christie triggered a days-long traffic jam near the George Washington Bridge as an act of political revenge.

U.S. Attorney Paul J. Fishman entered the fray on a day of rapid developments when Christie said he was "embarrassed and humiliated" by his aides and fired one of them. A Christie ally then refused to answer questions by a state Assembly committee, asserting his constitutional right against self-incrimination after a judge said she wouldn't block a subpoena summoning him.

"Our office is reviewing the matter to determine whether a federal law was implicated," Rebekah Carmichael, a spokeswoman for Fishman, said in a statement.

Superior Court Judge Mary Jacobson in Trenton refused an emergency bid by David Wildstein to block his testimony about four days of lane closures leading to the George Washington Bridge, which connects with Manhattan. Wildstein, who was a top executive at the Port Authority of New York and New Jersey, ordered the closures. The ensuing traffic snarls have increasingly tarnished the image of Christie, a Republican weighing a run for president.

Wildstein asserted his Fifth Amendment right more than two dozen times in response to questions at a hearing in the State House.

E-mails and texts released yesterday show that top Christie aides discussed closing the lanes from Sept. 9 to Sept. 12 as a way to punish the Democratic mayor of Fort Lee, Mark Sokolich. Sokolich didn't cross party lines and support Christie in his successful re-election bid last fall.

## 'Traffic Problems'

"Time for some traffic problems in Fort Lee," Bridget Anne Kelly, Christie's deputy chief of staff for legislative and intergovernmental affairs, wrote to Wildstein on Aug. 13.

"Got it," replied Wildstein, a high school friend of Christie. The governor fired Kelly today. Wildstein resigned from the Port Authority Dec. 6.

As a result of the lane closures, motorists were delayed for hours in trying to cross the Hudson River into New York. The Record newspaper reported that the traffic snarls delayed paramedics from getting to an unconscious 91-year-old woman who later died of cardiac arrest.

On the fifth day, officials on the New York side reopened lanes, easing the flow over a section of Interstate 95 that the Port Authority calls the busiest bridge in the world.

"We are appropriately going nuts," Wildstein wrote to Kelly on Sept. 13, as traffic flowed. David Samson, Christie's appointee as Port Authority chairman, was "helping us to retaliate" for easing the backups, Wildstein wrote.

## Proper Authority

Wildstein, who was subpoenaed by the Transportation, Public Works and Independent Works Committee, claimed in an emergency court filing that the legislature lacked the authority to compel his testimony. He also said Assemblyman John Wisniewski, a Democrat, issued the subpoena without proper authority and may not have signed it.

"This is an abuse of power by a legislative committee," Wildstein's attorney, Alan Zegas, argued at a court hearing in Trenton. "This is a matter of whether power by a governmental branch has been lawfully exercised."

Zegas also claimed that the committee overstepped its authority, which includes overseeing Port Authority finances.

At the hearing, committee attorney Leon Sokol argued that Jacobson doesn't have the authority to quash the subpoena.

"You'd be frustrating the ability of the Legislature to conduct its legislative authority," Sokol said. "You

have to allow this process to go forward, allow the committee to call the witness."

Proper Authority

Jacobson said that a legislative committee had the proper authority to subpoena Wildstein.

"There is jurisdiction to give a subpoena," Jacobson said. "There's no reason for the court to assume any bad faith on the part of this legislative committee. Where there's a legitimate public end, it's immaterial whether a political motivation is also present."

At a press conference today, Christie apologized for the traffic jam and said Kelly, the aide he fired, lied to him when he asked his senior staff a month ago whether they knew about the lane closings.

The Port Authority's Office of Inspector General referred the case to Fishman, according to Carmichael.

To contact the reporter on this story: David Voreacos in federal court in Newark, New Jersey, at

dvoreacos@bloomberg.net

To contact the editor responsible for this story: Michael Hytha at mhytha@bloomberg.net

# EXHIBIT 2

REPORT OF GIBSON, DUNN & CRUTCHER LLP
CONCERNING ITS INVESTIGATION ON BEHALF OF
THE OFFICE OF THE GOVERNOR OF NEW JERSEY INTO ALLEGATIONS
REGARDING THE GEORGE WASHINGTON BRIDGE LANE REALIGNMENT
AND SUPERSTORM SANDY AID TO THE CITY OF HOBOKEN

March 26, 2014

www.GDCReport.com

## I.  EXECUTIVE SUMMARY

What follows is the product of interviews with more than 70 witnesses and the review of more than 250,000 documents, including the personal texts and emails of the Governor, the Lieutenant Governor, and their senior staffers, over the past two months.  We were tasked by the Office of the Governor to investigate (i) allegations concerning the George Washington Bridge toll lane realignment at Fort Lee, and (ii) Mayor Zimmer's allegations concerning Superstorm Sandy aid allocations to Hoboken.  Based on our investigation, we are now in a position to address most but not all of these allegations, as several key witnesses have refused to cooperate with our investigation or asserted their Fifth Amendment rights.  But we have had the cooperation of all current members of the Governor's Office, former members of that Office, and other independent witnesses as well.  We are therefore confident that, based on our thorough review, we have a clear understanding of what happened here, even if the participants' precise motives remain to be determined.  We were also tasked by the Governor's Office to make recommendations, as warranted by our findings, to promote best practices going forward.  Here is a summary of our findings and recommendations.

### A.  George Washington Bridge Toll Lane Realignment At Fort Lee

From September 9 to 13, 2013, the Port Authority realigned two of the three George Washington Bridge toll lanes dedicated to local access from Fort Lee, thereby causing massive local traffic congestion for those trying to access the bridge from Fort Lee.[1]  There was no apparent forewarning to the Fort Lee Mayor's Office, the local police force, or local emergency services.[2]  Some Port Authority officials claimed this was just a study to assess a longstanding traffic issue,[3] but it soon thereafter emerged that, even within the Port Authority, this traffic study was so closely held that its Executive Director complained he did not know about it at the

1

February 3, 2014, five business days later.[199]  These subpoenas were all focused on the lane

realignment.[200]

### c.  The U.S. Attorney's Office For The District Of New Jersey

On January 8, 2014, in response to press inquiries about whether it had opened an

investigation into the Bridge lane realignment, the U.S. Attorney's Office for the District of New

Jersey (the "U.S. Attorney's Office") provided a statement to reporters:  "It is the policy of our

office to neither confirm nor deny the existence of investigations."[201]  The following day, in

response to the same or similar questions, a spokesperson for the U.S. Attorney's Office

confirmed publicly that the Inspector General for the Port Authority "has referred the matter to

us, and our office is reviewing the matter to determine whether a federal law was implicated."[202]

The U.S. Attorney's Office has since subpoenaed the Governor's Office regarding the

lane realignment.[203]

### 2.  Mayor Dawn Zimmer's Allegations Regarding Superstorm Sandy Aid For Hoboken, New Jersey

In the wake of media coverage regarding the Bridge lane realignment and beginning on

January 18, 2014, Hoboken Mayor Dawn Zimmer made several media appearances in which she

accused the Christie Administration of conspiring at the highest levels to coerce her into

advancing a stalled development project in exchange for Sandy relief aid.  Specifically, Mayor

Zimmer alleged that, starting in May 2013, three senior officials—Lieutenant Governor

Kimberly Guadagno, Executive Director of GORR Marc Ferzan, and Commissioner of DCA

Richard Constable—linked Hoboken's receipt of Superstorm Sandy aid to the approval of a

commercial development in Hoboken's North End sponsored by the Rockefeller Group, a private

real estate investment management corporation.  Beginning on January 18, 2014, Mayor Zimmer

released copies of her notebook in which she claimed she entered contemporaneous

memorializations of her assertions.  Incomplete copies of this notebook were released to the public through the media.  In addition, Mayor Zimmer appeared in television interviews over the next three days with MSNBC's Steve Kornacki,[204] CNN's Candy Crowley,[205] and CNN's Anderson Cooper,[206] asserting these allegations to the media and public.  Mayor Zimmer's allegations were repeated in numerous news reports,[207] and are discussed in greater detail in Section V.

On January 19, 2014, one day after she first aired her allegations, Mayor Zimmer released a statement saying:  "This afternoon I met with the U.S. Attorney's Office for several hours at their request and provided them with my journal and other documents."[208]  A few days later, Mayor Zimmer released a letter stating, once again, that she had "met with and spoken at length with the U.S. Attorney's office regarding this situation," and that the U.S. Attorney's Office had requested that she not speak publicly about the matter any further.[209]  On January 31, 2014, Mayor Zimmer's Office issued a statement confirming that "[t]he City of Hoboken has received a subpoena for documents" from the U.S. Attorney's Office.[210]

### B. Retention Of Gibson, Dunn & Crutcher LLP

#### 1. Purpose And Scope

On January 16, 2014, the Office of the Governor retained the law firm of Gibson Dunn to facilitate cooperation with the U.S. Attorney's Office's investigation and other relevant inquiries, conduct an internal investigation of the George Washington Bridge lane realignment allegations, and advise the Governor's Office on best practices and make recommendations for improvements going forward.[211]  Two days later, on January 18, 2014, Mayor Zimmer made public allegations regarding Superstorm Sandy aid,[212] which resulted in an expansion of the scope of Gibson Dunn's retention to investigate Mayor Zimmer's allegations as well.

Gibson Dunn's representation of the Governor's Office has specifically included: (1) the review and production of documents in connection with the U.S. Attorney's Office's and New Jersey Legislature's inquiries; (2) a thorough investigation of the facts relating to both the George Washington Bridge lane realignment and Mayor Zimmer's allegations regarding Superstorm Sandy relief; and (3) the preparation of a report discussing our findings and recommendations. Our report was provided to the U.S. Attorney's Office on {March 26}, 2014, consistent with our mandate to facilitate cooperation with that Office's investigation. Indeed, we have periodically briefed the U.S. Attorney's Office on our findings as our review progressed.

The principal objective of Gibson Dunn's investigation has been to determine the facts regarding both the Bridge lane realignment and Mayor Zimmer's allegations regarding Superstorm Sandy aid. In pursuit of that objective, we have interviewed more than 70 witnesses and reviewed more than 250,000 documents. We received the full and voluntary cooperation of the Governor and everyone currently in the Governor's Office. Our access to these witnesses was unfettered: we were able to interview whomever we wanted as often as we wanted, including the Governor and the Lieutenant Governor. We were also permitted access to personal emails, and texts, including those of the Governor and Lieutenant Governor, as well as personal phone records.

We also received cooperation from former members of the Governor's Office and many independent witnesses as well. Many of those individuals provided documents from both their work and personal email accounts. We have also reviewed internal Port Authority documents voluntarily produced to us, which included relevant documents from numerous employees' files, including Wildstein and Baroni. And we had the benefit of several Port Authority officials' sworn testimony before the Assembly Transportation Committee. Moreover, we requested and

36

Executive Director Marc Ferzan; Lieutenant Governor Kimberly Guadagno; and Governor Christopher J. Christie.

Our review of hard-copy and electronic materials was similarly comprehensive. We reviewed hundreds of thousands of emails collected from both the Office and individual employees—both work and personal webmail accounts. We reviewed electronic documents collected from employees' local hard drives, the Office's central server, user directories, and shared drives, as well as hard copy documents collected from individual employees of the Office. We reviewed text and chat messages harvested from both work and personal mobile phones. Our review of electronic items included users' mailboxes, sent mail, draft messages, and deleted files. We reviewed employees' phone records and electronic calendars, as well as the State House's visitor logs.

### C. Key Members Of Gibson Dunn's Investigation Team

The Gibson Dunn investigation team has included five former federal prosecutors with distinguished careers in public service.

***Randy M. Mastro*** is a Partner in Gibson Dunn's New York Office and Co-Chair of the Firm's Litigation Practice and Crisis Management Groups. Mr. Mastro is one of the nation's leading litigators. Last year, the *National Law Journal* named him among "The 100 Most Influential Lawyers in America." He has tried dozens of cases and argued more than 100 appeals in federal and state appellate courts throughout the country. His practice includes complex civil and transnational litigation, government-related and internal investigations, and white collar matters. From 1994 to 1998, Mr. Mastro served as Chief of Staff to Mayor Rudolph Giuliani and then as New York City's Deputy Mayor for Operations. From 1985 to 1989, Mr. Mastro served as an Assistant U.S. Attorney for the Southern District of New York, where he focused on organized crime racketeering cases. He also served as Deputy Chief of the Civil

39

Division in that U.S. Attorney's Office.  Mr. Mastro is an Adjunct Professor at the University of Pennsylvania Law School, and he formerly taught complex civil litigation at Fordham Law School.  He received his J.D. from the University of Pennsylvania Law School and his B.A. from Yale University.  He served as a Law Clerk to Justice Alan B. Handler of the New Jersey Supreme Court.

*Debra Wong Yang* is a Partner in Gibson Dunn's Los Angeles Office and Co-Chair of the Firm's White Collar Defense and Investigations, Information Technology and Data Privacy, and Crisis Management Practice Groups.  Her practice focuses on corporate crime and compliance, with a particular emphasis on internal investigations.  Last year, Ethisphere Institute named her one of the "Top Guns" among "Attorneys Who Matter."  She has led teams of attorneys conducting internal investigations and reviewing compliance programs across a variety of industries.  From 2002 to 2006, Ms. Yang served as the U.S. Attorney for the Central District of California, the largest U.S. Attorney's Office outside Washington, D.C.  She also served as an Assistant U.S. Attorney for seven years, investigating and prosecuting white-collar and computer crimes.  From 1997 to 2002, Ms. Yang served as a California State Judge on the Los Angeles Superior and Municipal Courts.  In 2009, Ms. Yang was selected by Los Angeles Mayor Antonio Villaraigosa to serve on the Los Angeles Police Commission, part of the civilian oversight committee of the Los Angeles Police Department.  Ms. Yang is an Adjunct Professor at the University of Southern California School of Law.  She received her J.D. from Boston College Law School and her B.A. from Pitzer College.  She served as a Law Clerk to U.S. District Judge Ronald S.W. Lew of the Central District of California.

*Alexander H. Southwell* is a Partner in Gibson Dunn's New York Office.  His practice focuses on white collar and regulatory defense, internal investigations, compliance monitoring,

and complex civil litigation.  From 2001 to 2007, Mr. Southwell served as an Assistant U.S. Attorney for the Southern District of New York, where he focused on public corruption cases, securities and commodities fraud matters, and computer hacking and intellectual property crimes.  Mr. Southwell is an Adjunct Professor at Fordham University School of Law where he teaches a seminar on cyber-crimes, the Fourth Amendment, and information security.  He received his J.D. from New York University School of Law and his B.A. from Princeton University.  He served as a Law Clerk for U.S. District Judge Naomi Reice Buchwald of the Southern District of New York.

*Reed Brodsky* is a Partner in Gibson Dunn's New York Office.  From 2004 to 2013, Mr. Brodsky served as an Assistant U.S. Attorney for the Southern District of New York where he successfully served as lead trial counsel for two of that office's most high-profile white collar criminal prosecutions:  *United States v. Raj Rajaratnam* and *United States v. Rajat Gupta*.  Mr. Brodsky received his J.D. from Vanderbilt University School of Law and his B.A. from Duke University.  He served as a Law Clerk for U.S. District Judge Hector M. Laffitte of the District of Puerto Rico.

*Avi Weitzman* is Of Counsel in Gibson Dunn's New York Office.  From 2005 to 2012, Mr. Weitzman served as an Assistant U.S. Attorney for the Southern District of New York, where he focused on complex white collar crime cases, securities fraud cases, and international and domestic organized crime prosecutions.  Mr. Weitzman received his J.D. from Harvard Law School and his B.A. from the University of Kentucky.  He served as a Law Clerk for Justice Dalia Dorner of the Israeli Supreme Court and U.S. District Judge Shira A. Scheindlin of the Southern District of New York.[214]

# EXHIBIT 3



NEW
JERSEY 101.5

ASK THE GOVERNOR

Presented by
LESTER GLENN
AUTO GROUP

# Christie Bridgegate Probe Blames Wildstein, Kelly

By Townsquare News Staff March 27, 2014 11:28 AM

 Share on Facebook   Share on Twitter

**The report detailing the Christie's administration's internal investigation into Bridgegate places the blame for the controversial lane closings at the George Washington Bridge and an ensuing coverup entirely on former Port Authority official David Wildstein and former Christie aide Bridget Kelly.**

In a 75-minute press conference Thursday morning, Randy Mastro, lead attorney for the internal investigation, said Kelly, who has been fired as a deputy chief of staff for Gov. Chris Christie, "consciously tried to cover up" her involvement in the scheme, even going so far as to ask another staffer to delete an incriminating email she had sent.

The report also calls allegations by Hoboken Mayor Bridget Zimmer, that Sandy aid to her city was being used to pressure her for approval of a development project, "demonstrably false."

Lt. Gov. Kim Guadagno, who Zimmer has accused of personally threatening a delay of Sandy aid to Hoboken, said the report: "It is clear that Mayor Zimmer's allegations do not stand up to scrutiny, and in truth, are demonstrably false based on contemporaneous documents, other witness accounts, and her own prior statement(s), all contained in the report. In fact, Mayor Zimmer's version of events was and is fictional."

Zimmer issued a statement calling the Mastro report a "one-sided whitewash of serious misconduct by the Christie Administration."

Mastro said the investigation found no prior knowledge or involvement by Gov. Christie in the lane closure scheme. The report dismissed suggestions to the contrary made by Wildstein– including a suggestion by Wildstein that *"he mentioned the traffic issue in Fort Lee to the Governor at a public event during the lane realignment—a reference that the Governor does not recall and, even if actually made, would not have registered with the Governor in any event because he knew nothing about this decision in advance and would not have considered another traffic issue at one of the bridges or tunnels to be memorable."*

Speaking on **Ask the Governor** on the Townsquare News Network Wednesday night, Christie said he had just received the report. Mastro of Gibson, Dunn and Crutcher, the attorney hired by Christie to handle the investigation, conducted the Thursday press conference at his New York City office.

The New York Times this week first reported that the Mastro-led investigation exonerated the governor of any wrongdoing in connection with Bridgegate. However, several key figures involved in the scandal did not speak with investigators, including Wildstein, Kelly and former Christie campaign manager Bill Stepien. Noting that, Townsquare's Eric Scott asked Christie Wednesday night if he understood why many people are skeptical about an unfinished internal report that clears him of wrongdoing.



GIBSON DUNN

Attorney Randy Mastro at Christie report press release (ABC 7)

"You don't just come to conclusions from interviews," Christie said. "There's lots and lots of documents that involve all those people which have been part of the public record or will be becoming part of the public record as we go forward and you can discern a lot from that…..I think all the important questions will be answered."

Kelly was Christie's deputy chief of staff. She was fired after an email apparently sent by her went public. In it, Kelly wrote: "time for some traffic problems in Fort Lee." Wildstein is the former Port Authority official who received that email. Stepien is Christie's two-time campaign manager. He was in line to chair the Republican State Committee and do consulting work for the Republican Governors Association. The governor relieved Stepien of both jobs after his involvement in Bridgegate became known.

Mastro Thursday made several allusions to a relationship between Kelly and Stepien that he said had ended by August of 2013, after which, Mastro said, the two were no longer speaking.

Christie Wednesday night said he received the report, which is more than 300 pages, Wednesday morning. He had yet to finish reading it but added: "I also said on Jan. 9 that we would do this investigation and that as soon as it became available to us, we would make it public without any restriction," Christie said. "And that's what we're doing tomorrow."

# EXHIBIT 4



𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘 | http://nyti.ms/1mwHXOF

## N.Y. / REGION

# Report Details Claim by Ally: Christie Knew of Bridge Lane Closings

By MICHAEL BARBARO    MARCH 27, 2014

The Port Authority official who directed the shutdown of lanes to the George Washington Bridge said that he informed Gov. Chris Christie of New Jersey about it at a Sept. 11 memorial ceremony while the lanes were closed, according to an internal review that lawyers for the governor released on Thursday.

The official, David Wildstein, who was a longtime political ally of the governor, told Mr. Christie's press secretary, Michael Drewniak, of the conversation at a dinner in December, on the eve of his resignation from the Port Authority of New York and New Jersey, according to the inquiry.

But the report said that Mr. Christie did not recall Mr. Wildstein's raising the topic during their interaction and, in a sweeping claim of vindication, found no evidence that he — or any current members of his staff — was involved in or aware of the scheme before it snarled traffic for thousands of commuters in Fort Lee, N.J., from Sept. 9 to the morning of Sept. 12.

The inquiry instead blamed, almost entirely, Mr. Wildstein and the governor's deputy chief of staff, Bridget Anne Kelly, for the scandal, describing Ms. Kelly as scrambling to cover up her role.

Mr. Christie has said previously that he did not know of the lane closings before or while they were occurring, making the account of the purported Sept. 11 exchange between Mr. Wildstein and Mr. Christie perhaps the most provocative revelation in the report, commissioned by the governor at a cost to taxpayers of at least $1 million. Throughout its 360 pages, the document wove together panicked private emails, derisive text messages and descriptions of dramatic confrontations between the

Republican governor and his staff as the controversy unfolded. Two parallel investigations, by the New Jersey Legislature and federal prosecutors, are not yet complete.

At a heated televised news conference, the former federal prosecutor who led the internal inquiry, Randy M. Mastro, frequently sounded like a defense lawyer making his case to a jury. He referred to Ms. Kelly as a liar, cast doubt on the credibility of the mayor of Hoboken, who accused the Christie administration of political intimidation, and slipped into lawyerly exhortations to the "ladies and gentlemen" sitting before him.

Mr. Mastro, and his report, went so far as to describe a romantic relationship between Ms. Kelly and a top adviser to Mr. Christie who has been caught up in the imbroglio, seemingly insinuating — without providing specific evidence — that its breakup may have colored her judgment.

The report seemed to anticipate a looming showdown between Mr. Christie and the person who may become the most menacing witness against him: Mr. Wildstein, who, Mr. Mastro said, harbored "bizarre personal and political animus."

"It will apparently be Wildstein's contention — as he alleged in early December 2013 to Drewniak — that he mentioned the traffic issue to the governor on that occasion," the report said, referring to the memorial ceremony, which was held at ground zero. Then it suggested why Mr. Wildstein's claim should not be given much weight:

"Whatever brief exchange they had occurred in a public setting where they were surrounded by many, including other Port Authority officials, the governor's wife, and a steady stream of spectators requesting photographs and handshakes with the governor. Not surprisingly, the governor has no recollection of such an exchange."

A lawyer for Mr. Wildstein previously said in a letter that "evidence exists" that Mr. Christie knew of the lane closings as they occurred. It was unclear if he was referring to the Sept. 11 encounter; Mr. Mastro clearly thought that he was.

The report did not say whether Mr. Wildstein's account of the Sept. 11 encounter included telling Mr. Christie why he had orchestrated the closings. Mr. Drewniak told investigators that at their dinner, Mr. Wildstein had called the closings part of a legitimate traffic study.

Mr. Wildstein, Ms. Kelly and Bill Stepien, the former Christie campaign official to whom Ms. Kelly, it was suggested, was romantically linked, all refused to be interviewed for the internal report, raising questions about its thoroughness.

Mayor Dawn Zimmer of Hoboken, a Democrat, also declined to be interviewed; she had accused the Christie administration of threatening to withhold recovery money for Hurricane Sandy if she refused to back a real estate project. The review, conducted by the corporate law firm Gibson Dunn & Crutcher, found her claims groundless.

The report did, however, outline extensive access to Mr. Christie; his lieutenant governor, Kim Guadagno; and the members of their staffs, many of whom turned over their work and private email accounts, cellphones and telephone records.

But for all its tantalizing details, gleaned from a review of 250,000 pages of documents and interviews with more than 70 individuals, the report failed to resolve a central question: What motivated the ham-handed lane closings?

Gibson Dunn lawyers wrote of an "ulterior motive" but could not identify it.

Mr. Wildstein, the report said, had seethed about Fort Lee's access lanes to the George Washington Bridge for years, calling them an unnecessary and unfair perquisite for a small town.

Still, the report strongly suggested that election-year politics factored heavily into the plot. Newly uncovered testimony and documents show that the night before Ms. Kelly wrote the now infamous email, "time for some traffic problems in Fort Lee," on Aug. 13, she called a member of the governor's campaign and asked whether the Democratic mayor of Fort Lee, Mark Sokolich, intended to endorse Mr. Christie for re-election, the report said.

Mr. Sokolich, she was told, would not. It was the first time a specific catalyst for the traffic-problems email was suggested.

Around the same time, Ms. Kelly expressed outrage after learning that a member of her staff had met with the Fort Lee mayor, suggesting that it was a violation of an attempt to freeze out Mr. Sokolich. She described herself as "really upset" and "on fire" over the meeting. A lawyer for Ms. Kelly did not respond to requests for comment.

The Gibson Dunn lawyers described Mr. Christie as blindsided by a plan that Ms. Kelly and Mr. Wildstein had hatched and determined to learn the truth about his staff's role.

In one meeting with his senior staff, held after the executive director of the Port Authority had condemned the lane closings as likely illegal, Mr. Christie raised his voice, paced the room and demanded his aides admit to any role in the case, the report recounted. "This is a mess, and now I have to clean it up," Mr. Christie told them, according to the report.

As the mess expanded, so did attempts by Ms. Kelly to mask her involvement, the report said. In mid-December, hours after the governor's chief of staff asked her whether she knew anything about the lane closings, she directed an assistant to delete a potentially incriminating email. In the message, Ms. Kelly had expressed pleasure at learning that the lane closings angered Fort Lee's mayor. "Get rid of that," she said, according to the report. (The aide did, but saved a copy.)

Mr. Christie later fired Ms. Kelly and cut ties to Mr. Stepien. A longtime friend and counsel, Mr. Stepien confided to another Christie adviser that he was "upset to be thrown under the bus," the report said.

Despite Ms. Kelly's senior status, the internal inquiry concluded that her behavior was "aberrational" and dismissed claims from Democrats that the governor fostered or condoned a culture of partisan payback. It called such claims "unsubstantiated."

"We found that this was the action of the few," Mr. Mastro said at the news conference, in Gibson Dunn's offices in Midtown Manhattan. "This is not reflective of the whole."

Nevertheless, Mr. Mastro and his legal team recommended a series of immediate changes to the structure of the governor's office: the creation of an ombudsman to begin restoring public trust, the appointment of an ethics officer to train the governor's staff and the elimination of the intergovernmental affairs office that Ms. Kelly oversaw.

In finding no fault with Mr. Christie in the Hoboken case, the report took a swipe at Ms. Zimmer, the mayor, saying that documents, witnesses and the mayor herself had contradicted her claims. "Our investigation found that Mayor Zimmer's allegations are, in material respects, demonstrably false," the report said.

Ms. Zimmer fired back later on Thursday, saying in a statement, "Randy Mastro could have written his report the day he was hired and saved the taxpayers the million dollars in fees he billed in generating this one-sided whitewash."

Local and national Democrats accused Mr. Christie of rushing out an incomplete internal report to revive his political fortunes and seized on his plans to sit down for a network television interview on Thursday night, then head to Las Vegas this weekend for a Republican conference.

"The idea that Bridget Kelly and David Wildstein by themselves concocted the lane closure is frankly hard to believe," said State Assemblyman John S. Wisniewski, co-chairman of the legislative committee investigating the case. "Lawyers hired and paid for by the Christie administration will not be the final word on this matter."

### *Correction: March 27, 2014*

*An earlier version of this article misstated some circumstances of an internal investigation into lane closings at the George Washington Bridge. It is Bridget Anne Kelly who is fighting requests from state investigators to turn over personal materials related to the scandal, not Ms. Kelly and David Wildstein.*

Reporting was contributed by David W. Chen, William K. Rashbaum, Marc Santora and Kate Zernike.

A version of this article appears in print on March 28, 2014, on page A1 of the New York edition with the headline: Report Details Ex-Ally's Claim About Christie.

---

© 2015 The New York Times Company

# EXHIBIT 5

Christie Bridgegate legal tab rises to $7.75 million



# Christie Bridgegate legal tab rises to $7.75 million

**Susan K. Livio | NJ Advance Media for NJ.com** By **Susan K. Livio | NJ Advance Media for NJ.com**
**Email the author | Follow on Twitter**
on May 08, 2015 at 6:23 PM, updated May 13, 2015 at 4:56 PM

**TRENTON** — The legal tab for taxpayers topped $7.75 million for the private law firm hired by Gov. Chris Christie in the wake of the George Washington Bridge lane closings scandal, according to the latest billing vouchers through April.

The heavily-redacted bills the state Attorney General's Office released late Friday in response to a public records request represent the money earned by the law firm, Gibson, Dunn & Crutcher, which represents the governor in the investigation into the September 2013 lane closings.

Last week, prosecutors **unsealed an indictment** against Christie's former deputy chief of staff Bridget Kelly and former Port Authority deputy executive director Bill Baroni for allegedly orchestrating the lane closures. The motive, according to the indictment, was political payback against the Democratic Mayor of Fort Lee, Mark Sokolich, who did not endorse the governor during his reelection campaign. Kelly and Baroni pleaded not guilty on Monday.

David Wildstein, also a former Port Authority official, **pleaded guilty** last week to two counts of conspiracy in exchange for his cooperation.

Gibson Dunn attorneys bill at $350 an hour, according to the Attorney General's Office. The firm billed $32,088 in December; $106,325 in February, $37,731 in March; and $53,824 in April, the attorney general's office said.

Taxpayers also have paid $1.2 million last year to private law firms retained by other state employees embroiled in the scandal.

The law firm last year produced a report written by former federal prosecutor and firm partner Randy Mastro **that said the governor had no knowledge or involvement in the scheme.**

The legislative committee investigating the land closures has spent just under $1 million in legal fees, co-chairman John Wisniewski said,

*NJ Advance Media staff writer* **Samantha Marcus** *contributed to this report.*

*Susan K. Livio may be reached at* ***slivio@njadvancemedia.com****. Follow her on Twitter* ***@SusanKLivio****.*
*Find* **NJ.com Politics on Facebook.**

# EXHIBIT 6

# OUTSIDE COUNSEL GUIDELINES



STATE OF NEW JERSEY
DEPARTMENT OF LAW & PUBLIC SAFETY
**OFFICE OF THE ATTORNEY GENERAL
DIVISION OF LAW**
25 MARKET STREET
TRENTON, NJ 08625

Effective: January 1, 2015

## Table of Contents

I.    INTRODUCTION ................................................................................................ 2
II.   RETENTION .................................................................................................... 2
III.  CONFLICTS OF INTEREST ............................................................................. 3
    A.   Initial Conflicts Check ............................................................................ 3
    B.   State Agency Conflicts ........................................................................... 3
    C.   Continuing Obligation ........................................................................... 4
    D.   No Representation of Other Persons/Entities Absent Approval ............ 4
IV.  OUR WORKING RELATIONSHIP ................................................................... 5
    A.   Identification of Objectives/Relationship Attorney ............................. 5
    B.   Early Case Assessment/Cost Assessment .............................................. 6
    C.   Staffing ................................................................................................... 7
    D.   Rates ...................................................................................................... 8
    E.   Acceptable Fees/Charges ....................................................................... 9
    F.   Discovery ............................................................................................. 12
    G.   Settlement ............................................................................................ 12
    H.   Exceptions to Guidelines ..................................................................... 13
    I.   Media Relations/Law Firm Advertising .............................................. 13
    J.   Engagement of Secondary Law Firms .................................................. 13
    K.   Engagement of E-Discovery and Other Vendors, Including Experts ........... 14
    L.   Adherence to Ethical Standards ........................................................... 14
    M.   Malpractice Insurance ......................................................................... 15
    N.   File Retention ...................................................................................... 15
V.   CONFIDENTIALITY ...................................................................................... 15
VI.  INVOICING POLICY ..................................................................................... 16
    A.   Invoice Format ..................................................................................... 17
    B.   Appealing From Deductions ................................................................ 17
VII. GRATUITIES ................................................................................................. 18
    APPENDIX A ............................................................................................... 1
    DOCUMENT ATTACHMENT ...................................................................... 1
    APPENDIX B ................................................................................................ 1
    Confidentiality agreement ........................................................................... 2
    APPENDIX C ................................................................................................ 1
    USING COUNSELLINK ............................................................................... 1
Budgeting ........................................................................................................ 1
Staffing ............................................................................................................ 1
Invoice Submissions ....................................................................................... 1
    APPENDIX D ............................................................................................... 4
    PAYMENT VOUCHER ................................................................................ 4

## I.     INTRODUCTION

The Attorney General of New Jersey, through the Department of Law and Public Safety, Division of Law ("Division"), serves as legal representative and counsel for the departments, boards, offices, authorities, agencies, commissions, and other instrumentalities of the government of the State of New Jersey ("State"), along with their officers and employees. When appropriate, the Division will retain outside counsel to represent the State.

In those cases where the Division retains outside counsel, the objective of these Outside Counsel Guidelines ("Guidelines") is to ensure the highest quality legal representation and services for the State while maintaining effective supervision and cost controls.

In many respects, these Guidelines resemble those in the private sector. However, some charges and disbursements that private clients may accept as reasonable may not be acceptable in matters for a public agency. Accordingly, these Guidelines contain some important differences from private sector policies of which outside counsel should be aware.

These Guidelines are effective for all work performed beginning January 1, 2015. They supersede previously issued guidelines and, unless exceptions are approved in writing by the Director of the Division of Law or his or her designee, constitute the terms under which outside counsel are engaged. The "Guidelines of the Attorney General for the Selection of Bond Counsel under Executive Order No. 26" dated March 30, 1995, remain in full force and effect, except that in the event of any conflict between those 1995 Guidelines and these Guidelines with respect to billing and payment of fees to Bond Counsel, these Guidelines shall control.

**BY ACCEPTING AN ENGAGEMENT BY THE STATE, LAW FIRMS WILL BE DEEMED TO HAVE FAMILIARIZED THEMSELVES WITH THESE GUIDELINES AND TO HAVE AGREED TO ADHERE TO THEM IN ALL RESPECTS, NOW AND AS THEY MAY CHANGE FROM TIME TO TIME UPON WRITTEN NOTICE. THIS ACCEPTANCE IS A MATTER BOTH OF CONTRACT AND PROFESSIONAL RESPONSIBILITY.**

The Division expects you to inform all attorneys, senior managers and billing team members working on State matters of these Guidelines. Any questions about the Guidelines should be promptly directed to the Division attorney designated in the written engagement letter as the principal point of contact (the "Designated Attorney").

The Division reserves the right to amend these Guidelines from time to time, providing written notification to outside counsel within thirty (30) days of the effective date of any substantive changes.

## II.     RETENTION

The State will retain outside counsel through a written retention letter and packet. (Note that counsel may begin work pursuant to oral retentions; the retention letter will follow shortly thereafter.) As described in the retention packet, New Jersey law contains additional requirements applicable to retentions. Please note that several of these requirements involve submitting additional information on the forms provided and/or referenced.

Outside counsel must properly execute the original of the retention letter and complete and execute all additional forms the retention packet may require, and must provide all additional documentation or information the retention packet requests.  Counsel must return to the Designated Attorney a signed original of the executed retention letter, together with all other required information and documents, in accordance with the letter's instructions.

Invoices will not be eligible for payment until outside counsel has returned to the Designated Attorney the retention letter and all documents properly completed and executed, and until counsel has satisfied all requirements for retention as specified in the retention letter and its attachments.  Using the "Document Attachment" feature described in Appendix A, outside counsel must also attach these forms and information to the matter number the State assigns through LexisNexis CounselLink™, its electronic billing and matter management provider.

## III.    CONFLICTS OF INTEREST

### A.    Initial Conflicts Check

Outside counsel must be sensitive both to direct conflicts of interest that representation of the State and other clients poses, and to the less direct, but nevertheless serious, conflicts that may arise from the same firm's advocacy, on behalf of other clients, of positions conflicting with important State interests.  Prior to your engagement, your firm should carefully review whether any conflicts of either type exist and, if so, bring those conflicts to the attention of the Designated Attorney.  The Division expects to be promptly informed of and consulted with respect to all potential conflicts.  Although issue conflicts may not necessarily result in a disqualification of your firm, the Division does expect to be consulted before your firm accepts an engagement that will require the firm to advocate a position that may be adverse to a State legal interest or otherwise prejudicial to the interests of the State.  The Division in its sole discretion shall, after consultation with you, determine whether an impermissible State agency conflict exists, or whether other circumstances exist that would undermine the public's confidence if your representation continued.

Outside counsel's acceptance of an engagement on a matter without written disclosure of any conflicts constitutes outside counsel's representation that it has conducted an appropriate conflict check and no conflict exists.

### B.    State Agency Conflicts

The Division has a duty to protect the public interest.  As part of this responsibility, the Division sets policies to ensure that the legal system operates in a manner that safeguards the public's confidence in the integrity and impartiality of its administration.  For this reason, in addition to insisting that its attorneys follow the Rules of Professional Conduct, the Division prohibits outside counsel that represent a State agency, while such matter is pending, from:

(1) Representing private parties before that State agency (or its officers) in adversarial, transactional or non-adversarial proceedings.  By way of example and not limitation, outside counsel are prohibited from representing any private party before a client agency in connection

3

with applications for government approvals, as well as in quasi-judicial and/or quasi-legislative proceedings before that client agency.  Outside counsel also may not, on behalf of a private client, lobby a State agency they represent.

(2) Representing private parties in any matter in which the State agency also is a party, if the private party has interests adverse to the State agency.

(3) Representing the State agency in a matter involving a private party, if the firm concurrently represents that private party in other matters.

(4) Being adverse to the State agency the firm represents on behalf of a private client (*i.e.* within the meaning of RPC 1.7).

(5) Representing another client if that representation would present a substantial risk that outside counsel's responsibilities to the State agency would limit its ability to provide independent advice or diligent and competent representation either to the State agency or the other client.

(6) Representing another client where the outside counsel's knowledge of the State's legal positions or strategy, derived from its representation or prospective representation of the State agency, could be used to the advantage of the other client or the disadvantage of the State.

**Note that, pursuant to New Jersey law, State agencies cannot consent to or waive conflicts of interest.**

In accordance with the disclosure obligations set forth above, outside counsel must promptly and fully disclose to the Designated Attorney any potential conflict of interest.  As noted above, the Division's determination, in its sole discretion, that a conflict exists shall be binding on outside counsel.

**C.     Continuing Obligation**

The obligation to disclose conflicts continues throughout the course of the representation. Outside counsel must review conflicts of interest on an ongoing basis as new matters are opened. Any new attorney/client relationships that potentially create a conflict shall be reported to the Designated Attorney immediately.

**D.     No Representation of Other Persons/Entities Absent Approval**

Outside attorneys engaged to represent a particular State entity (as opposed to a named person) should consider themselves to have formed an attorney-client relationship *only* with that entity, and not any of its individual employees.  When speaking with current or former employees of the client entity, outside counsel should, as appropriate, advise those employees that although their dialogue will be considered attorney-client communications to the fullest possible extent, counsel's responsibility is to the client entity and they do not represent those employees in their individual capacities.  As a matter proceeds, if employees of a client entity will be examined under oath or interviewed in other adverse contexts, and if outside counsel believe it advisable for them to represent the employees in their individual capacities at such

4

events, outside counsel <u>must</u> obtain the Designated Attorney's advance consent before agreeing to represent such persons in their individual capacities. The Designated Attorney, in consultation with other Division personnel, will determine if it is appropriate for the individual to receive representation and, if so, by whom.

Outside counsel who are engaged to represent both an entity and employees of that entity simultaneously are expected to take all necessary steps to ensure the continuing absence of conflicts, and to preserve their ability to continue representing the entity in the event that conflicts develop between the entity and individual clients.

## IV.    OUR WORKING RELATIONSHIP

### A.    Identification of Objectives/Relationship Attorney

The deputy attorney general (DAG) or assistant attorney general (AAG) assigned as the Designated Attorney in a matter will be your regular point of contact for financial and strategic decisions. (In rare cases, the Designated Attorney may be an employee of another State office or agency.) Only the Designated Attorney, that person's superior, the Director of the Division of Law and/or the Attorney General have authority to direct outside counsel in the handling of the matter. Outside counsel shall not initiate contact with any other State employee unless specifically authorized. If a State employee other than one listed above asks outside counsel to proceed in a certain fashion or to perform certain activities with respect to a specific legal matter, outside counsel should report the request to the Designated Attorney and obtain direction prior to proceeding.

The Designated Attorney will be your firm's principal contact with the Division. Outside counsel shall designate a Relationship Attorney to be the Designated Attorney's principal contact. Outside counsel may expect the Designated Attorney to provide clear, specific instructions; communicate the State's objectives; closely monitor the management plan and budget; follow the progress of the matter; keep outside counsel informed of important developments; and act as liaison between outside counsel and the State. In all matters, the State remains ultimately responsible for making all substantive decisions and determining the costs and benefits of contemplated legal activity. In many matters, Division attorneys will act as full co-counsel and be engaged with you in the day-to-day conduct of the case. In matters where you are handling that day-to-day conduct without Division personnel as co-counsel, the Division expects to be consulted on a regular basis throughout the course of your engagement and to be kept fully informed of the current status and proposed course of the matters assigned to your firm. All strategic, tactical, staffing (including any proposed staffing changes) and significant resource allocation decisions about State legal matters must be made in collaboration with the Designated Attorney. Please be advised that, in some prior cases, courts have directed that all filed papers must be signed or co-signed by a Division attorney.

Documents prepared for service or filing should be sent to the Designated Attorney with enough lead time to allow for meaningful review (*e.g.,* a minimum of one week for major briefs). Only in exceptional circumstances should the lead time for any non-urgent matter be less than three business days. You should ask the Designated Attorney about exceptions to this requirement for routine documents, such as stipulations extending time, and when extraordinary

circumstances will prevent you from providing the reasonable lead time specified in this paragraph. No motions, briefs or other correspondence with a court may be filed on behalf of the State unless those briefs have been approved by the Designated Attorney (or, in the event of the Designated Attorney's unavailability, with the approval of another member of the Division team handling the case). Unless otherwise instructed, outside counsel shall forward copies of all substantive pleadings and correspondence to the Designated Attorney, once sent or filed.

In certain types of cases, including but not limited to medical malpractice actions, the Designated Attorney may agree to alternate procedures for review of documents prior to filing. The Designated Attorney will advise outside counsel as to whether these alternative procedures govern the entire matter or specified portions of it.

In some instances, the Division may elect to use cost-effective internal resources or expertise for particular aspects of a legal matter. It therefore is essential that the Division be consulted in advance of all contemplated significant steps in a matter. In that way, we can jointly determine, for instance, whether a particular research project is necessary, whether a task can be handled internally, if a motion should be made, how document gathering and review can be handled most economically, if and when settlement discussions should begin, and who should conduct those discussions. Obviously, the Division expects that the time, money and other State resources spent on any legal matter must be commensurate with its significance. The Division expects the outside counsel it retains to work with it to successfully resolve matters with dispatch and cost effectiveness.

**THE STATE WILL NOT BE RESPONSIBLE FOR ANY LEGAL FEES OR COSTS INCURRED WITHOUT THE SPECIFIC APPROVAL OF THE DESIGNATED ATTORNEY OR OTHERWISE INCURRED OUTSIDE THESE GUIDELINES.**

### B.     Early Case Assessment/Cost Assessment

Each complex matter is to be thoroughly evaluated at its outset. The same applies to actions in which the State is the plaintiff, except that the analysis will be performed before the case is filed. In any matter where the legal costs or exposure may be substantial (*i.e.,* where $250,000+ is at stake or the prospect exists of significant injunctive relief), the State may ask that you provide an early case assessment that includes analysis of (1) likely costs to the State from the process, (2) possible outcomes, indicating the likelihood of each, and (3) strategy and tactics for termination or resolution. The format of the early case assessment may vary from a formal written document to a verbal briefing or a combination of a written budget with a verbal briefing on other aspects of the case. You should discuss the most desirable format with the Designated Attorney when you are requested to prepare an early case assessment.

In most matters, unless the Designated Attorney advises outside counsel to follow a different procedure – in which case the Designated Attorney will advise as to when a budget should be prepared and for what period of time – outside counsel will be required to provide a budget for the life of a case and cost estimates for important phases of a case as soon as practicable after counsel are engaged. In general, a life-of-case budget should reflect major assumptions, conform to the established management plan, identify specific work phases and estimate the cost of each phase, identifying projected fees and disbursements. The Division

reserves the right to revise any budget prepared by outside counsel, may offer a template budget based on past experience in similar cases, and of course has final authority to approve any budget. The Designated Attorney ordinarily will ask that budget materials be entered through CounselLink using the Budget feature. See Appendix C. Counsel then should update these estimates whenever a significant change to prior estimates is contemplated.

      **Please note that time spent preparing a budget is not billable,** but counsel may bill for time spent preparing an early case assessment or a recommended discovery plan.

      The Division places significant reliance on cost estimates and expects outside counsel to prepare them with care. Although the Division understands that unanticipated events may have an impact on costs, we expect to be consulted promptly if you believe that the most recent cost estimate you have provided is no longer accurate. **Should total fees or costs exceed the agreed budget, or should fees or costs for a phase of the case exceed the agreed estimate for that phase, without adequate explanation in advance that the increased expense will be necessary, the Division may require that an increased discount be applied to unanticipated fees or costs and reserves the right not to pay outside counsel for any amounts incurred or expended in excess of the approved budget or estimate.**

      For bond matters and other transactional engagements, counsel may be expected to provide a fee cap for the transaction, approved by the Division, prior to commencing work. Only where a transaction materially changes in scope will the Division consider revisions to an agreed fee cap. **No payments above the agreed fee cap shall be made unless and until a revised fee cap has been approved in writing by the Director of the Division or his/her designee.**

### C.    Staffing

      Law firm staffing decisions regarding the attorneys who will work on a State matter, including both the overall staffing structure and the specific individuals involved, should be discussed in advance with the Designated Attorney. The Division expects to approve all attorney staffing. Unless otherwise agreed, the Division expects the lead attorney retained to be directly and ultimately responsible for the entire assignment. The day-to-day involvement of that lead attorney, however, should be appropriate to the magnitude of the matter and the efficiency required for a timely, cost effective, quality work product. When a senior lawyer can handle an assignment most efficiently (based on skill and experience), we expect that lawyer to complete the assignment. Work suitable to more junior attorneys should be delegated. Attorneys should never bill to perform tasks that could be effectively handled by support personnel.

      The Division expects lean staffing on its matters. The Division generally expects to be billed for only one attorney to attend events such as depositions, witness meetings, settlement conferences, negotiations and meetings with other parties' counsel. We recognize that in more complex matters and those with multiple work-streams, it may occasionally be appropriate for multiple attorneys to attend significant events and for members of the team to consult with each other. We insist, however, that no more than the minimum number of attorneys necessary to an event attend, that billable internal conferences and charges for drafting and reading internal email correspondence occur only when absolutely required, and that the Designated Attorney be

regularly informed both of the number of attorneys who will attend significant events and the reason for the attendance of each billing timekeeper.

As noted above, because there often are instances when the State has attorneys with expertise in a specialty area, it may well be more cost effective and efficient for these internal professionals to be used instead of (rather than in addition to) specialists at your firm.

The State believes that it is most efficient for a single attorney or group of attorneys to handle a matter from beginning to end and expects outside counsel to strive for such continuity. The State will not pay for learning time that may result from staffing changes at your firm. In addition, the State will not reimburse outside counsel for any routine training or supervisory time, including time spent at seminars, unless specifically approved in advance and included as part of the budget. The State will not ordinarily pay for summer associate time unless such time has been identified as part of the approved staffing plan for appropriate work. The State does not expect to be billed and will not pay for time submitted by librarians; secretaries; billing, filing, docketing or document clerks; internal messengers/couriers; temporary or clerical support staff; word processors; and IT professionals other than electronic discovery specialists serving a function similar to that of paralegals/case managers. The State also will not pay for time billed by attorneys or paralegals to perform tasks (filing, indexing, etc.) that could and should have been handled by support personnel.

If the Division determines, after consultation with outside counsel, that staffing is inappropriate for particular tasks performed, the hourly rate charged may, in the Division's sole discretion, be reduced to a rate consistent with that of a lower level professional. Similarly, if the Division determines that excessive time was spent on a particular task, the time billed may be reduced at the Division's sole discretion. **Please review the Acceptable Fees/Charges section below for a list of clerical and administrative tasks that should not be billed, and will not be paid, no matter who performs the work.**

In those cases being handled on a contingency fee basis, the above requirements should serve as guidelines for determining outside counsel's lodestar. Similarly, outside counsel shall, whenever possible, comply with these Guidelines concerning fees, administrative tasks, disbursements and costs, and travel, notwithstanding the fact that outside counsel may not be submitting monthly invoices for payment to the State. Lodestar information and expenses for which reimbursement will be sought must be submitted at least quarterly via informational invoicing through CounselLink as discussed above.

**D.    Rates**

The State will pay for actual services rendered at rates established in Requests for Qualifications or otherwise agreed to in advance. At the time of your initial engagement, your firm shall furnish the Designated Attorney with a schedule of billing rates for partners, associates and all other timekeepers expected to bill time against the matter for review and approval prior to billing time to the State. **Because of State procurement rules, the rates applicable at the inception of each specific matter must remain in effect for the duration of that matter.** Hourly rates should include all overhead costs (*see* Acceptable Fees/Charges, below), none of which should be included in disbursements.

8

Time must be billed in 0.1 hour increments and on a per-task basis. The time entry description must be specific, detailing the action taken and the subject matter. **Absent prior consent, the Division will not pay for more than ten (10) hours of time by a single timekeeper in a single day**, but the Designated Attorney may increase that number of permissible hours in matters of special urgency or where cases are in or approaching trial.

The Division will consider alternatives to traditional hourly billing, including fixed-fee arrangements, reduced hourly rates with incentive bonuses, value billing, negotiated discounts and blended rates. The State has adopted such alternative fee arrangements in appropriate circumstances and encourages outside counsel to propose them.

Outside counsel should bear in mind that invoices may be disclosed pursuant to the State's open records laws and that courts may not sustain assertions of privilege by the Division. Although the Division will endeavor to redact privileged information before releasing bills for public consumption, counsel should, to the extent practicable and consistent with the need to fully inform the Division of its activities and to allow the Division to evaluate the reasonableness of billing narratives, avoid the inclusion of privileged matter in invoices.

E.      **Acceptable Fees/Charges**

***Overhead charges may not be billed.*** The State will not reimburse outside counsel for basic support services, which the State deems to be part of outside counsel's overhead and built into its rates. The State will not pay for any of the following items under any circumstances:

- Billing inquiries
- Opening and closing files
- Internal filing
- Secretarial services (including overtime charges)
- Word processing or proofreading
- Maintenance of a calendar or tickler system
- Investigating potential conflicts
- Preparing budgets
- Library usage (including book purchases or subscriptions) or library staff time
- Office supplies
- Conference room charges

***Basic legal research may not be billed.*** Outside counsel is expected to be familiar with the basic substantive law at issue in the matter for which the firm was retained, and the State should not be charged for this type of research. If legal research benefits other clients, only the proportionate share of that cost should be billed to the State. The State also expects to benefit from previously prepared briefs and memoranda, and when such briefs or memoranda exist, will pay only for actual time spent updating or tailoring the same. All other anticipated legal research should be addressed in outside counsel's proposed budget. Legal research projects necessary in a particular litigation assignment must be approved in advance by the Designated Attorney before the research is commenced.

The State will pay only for the actual time spent by outside counsel or other approved timekeeper conducting the research.  As explained *infra*, fees charged by electronic or other research services, including library fees, Westlaw, Lexis and other online services are considered general overheard and are not reimbursable.

***Out-of-pocket costs must be itemized and passed through with no markup.***  The State will reimburse outside counsel for reasonable, documented and itemized out-of-pocket disbursements and costs incurred on behalf of the State, with the exceptions and limitations set forth in these Guidelines.  Outside counsel's invoices to the Division should reflect the actual cost and should not include any markup.  All disbursements must be fully itemized with a description sufficient for review, identifying the number of units, price per unit and total cost. The State may refuse to pay for disbursements billed as 'miscellaneous,' billed in a group (e.g., Travel Expenses - $4,000.00) or disbursements without descriptions.

***Prohibited disbursements.***  The State considers certain disbursements to be part of a law firm's overhead and will not pay such charges.  These items include:

- Rent (including temporary office space)
- Westlaw, Lexis and other legal database services
- Cost or usage of computers or mobile devices or internet service charges
- Equipment rental
- Storage charges
- Catering for internal meetings
- Meals (except during business travel, and then limited to $70 per day)
- Mileage for short trips (<30 miles one way)
- Travel costs exceeding discounted, non-refundable coach fares except where excess costs have been approved in advance
- Telephone charges
- Facsimile charges
- Allocated charges from a firm's blanket service agreements with outside vendors

***Copying/scanning.***  Copying charges may be billed to the State at the lesser of the most favorable rate applied by your firm or eight cents per page for black and white copies and fifty cents per page for color copies when color copies are reasonably necessary.  The State will reimburse for document scanning at your firm's regular rate, up to a maximum of eight cents per page, for document productions, but the State will not pay time charges associated with scanning, and there should be no charges associated with the scanning and filing of court papers and correspondence.  Every effort should be made to minimize scanning expenses by working with documents in electronic format whenever possible.

***Couriers and Overnight Mail.***  The State will reimburse for actual charges billed to the firm for deliveries (including overnight express) that are necessary in the interest of speed and reliability.  The Division expects you to use the lowest cost service consistent with need and reliability, and to arrange schedules, whenever practicable, to avoid the need for premium-priced couriers.  We expect you to consider using less expensive means, such as email (encrypted, when necessary) or regular mail where it is practical to do so.

10

***Travel Expenses Must Be Reasonable.*** All air and rail travel must be first approved by the Designated Attorney, ideally as part of the case budget. The State expects its outside counsel to use good judgment in selecting hotels and restaurants and incurring expenses for which the taxpayers are to be charged. Alternatives to travel such as conference calls or videoconferences are strongly encouraged and should be used by outside counsel whenever practicable. If the travel involves another client, the State expects to be billed only for its proportionate share of both time and related expenses. **Except for driving time in some cases as specified below, non-working travel time is not billable without the Designated Attorney's prior approval.**

***Automobile Expenses/Billing for Driving Time.*** The State will reimburse outside counsel at a rate not exceeding the prevailing IRS-allowed mileage rate for business travel of 30 miles or longer each way (unless a lesser rate is negotiated), and the driver may bill the associated travel time at 50% of that counsel's agreed rate. The Designated Attorney, in appropriate cases, may lower the 30-mile threshold. The State will reimburse the actual costs of taxicab, train or bus travel, or tolls and parking charges for a personal car, if necessitated by State business and not part of outside counsel's commuting cost. If a rental car is the most economical option, the State will reimburse up to intermediate/mid-size class unless three or more lawyers are traveling together, in which case a full-size car would be appropriate.

***Reimbursement of Meals for Overnight Travel.*** The State will reimburse for meals consumed while traveling <u>overnight</u> on State business, but limited (absent prior approval) to no more than seventy dollars ($70) per person, per day. Under no circumstances will the State reimburse costs for alcoholic beverages.

***Maintenance of Expense Records.*** To ensure compliance with the State's reimbursement policies, all firms shall require itemization of out-of-pocket expenses such as airline tickets, meals and hotel bills before making reimbursement to any attorney, employee or third party, and maintain original receipts. Travel and meal expenses and receipts may be audited and shall be retained by outside counsel in accordance with applicable IRS guidelines. Unless requested to do so by the State, outside counsel should not forward copies of travel and meal expense receipts to the State with the firm's invoices.

***Personal Expenses Not Reimbursable.*** Please take care to distinguish between personal expenses and properly chargeable business expenses. The State will not reimburse for, among other things, recreation fees, salon or spa charges, pay-per-view movies or other personal entertainment charges, airline baggage charges, travel agency expenses, shoe shines, toiletries, dry cleaning or laundry (except in the unlikely event travel of more than seven days' duration is required), or luggage.

***Be Mindful of State Ethical Guidelines.*** When hosting or traveling with Division or other State personnel, please bear in mind that State employees are bound by strict ethical guidelines and cannot accept gifts of any kind—including meals—from outside counsel. We urge you not to place Division colleagues in the uncomfortable position of, for example, having to pay out-of-pocket because the outside lawyer has chosen an expensive restaurant in which to hold a discussion about the matter.

11

*Vendor discounts must be passed through.* If your firm receives a discount or rebate from a vendor based on your aggregate level of business with that vendor, the State expects such discount to be disclosed and to receive the benefit on a proportionate basis. This does not include frequent-flyer miles or similar perquisites allocated to individual travelers.

*Filing fees.* The State is exempt from paying any filing fees in the Superior Court of New Jersey (including the trial court level and Appellate Division) and the Supreme Court of New Jersey. **Consequently, any such fees mistakenly paid by outside counsel will not be reimbursed.** The State will reimburse the actual cost of any approved court filings in any jurisdiction where the State is not exempt from paying applicable filing fees.

F.    **Discovery**

You must discuss discovery planning with the Designated Attorney at the outset of the matter and throughout the life of the case. Ordinarily, in each case where significant discovery is anticipated, the Division will expect you to prepare a written process memo. The process memo should set forth your plan for discovery, including electronic discovery, the tasks that must be completed, the allocation of responsibility for each task and a budget. **When a process memo is required, the Division will not be responsible for any charges incurred where the work is not contemplated by the memo or exceeds the stated budget, absent prior agreement.** The State will insist on processes that mitigate risk and are cost-effective, while meeting all discovery obligations imposed by applicable rules, practices, and orders.

Document review processes should be discussed and agreed upon in advance with the Designated Attorney. In cases requiring significant document review, the Division prefers Technology Assisted Review ("TAR") to manual review when TAR is an appropriate substitute for manual review. Where manual review must be undertaken, the Division generally prefers first-pass review to be conducted by non-associate in-house reviewers or contract reviewers, closely supervised by outside counsel. Only in matters of significant complexity or sensitivity will it be appropriate to use associates for first-pass relevance reviews. We also ask that particular care be given to ensure that internal firm consultation and reporting about reviews is done cost-effectively. In the event outside counsel engages contract attorneys, the associated charges should be passed through as disbursements, with no cost markup.

G.    **Settlement**

Outside counsel have no settlement authority unless and until such authority is explicitly conferred on them by the Designated Attorney. If you believe that settlement should be pursued, you must seek instructions in this regard from the Designated Attorney, and not pursue formal or informal settlement discussions without the Designated Attorney's approval. Outside counsel should immediately inform the Designated Attorney of any settlement proposal or overture, formal or informal, by the opposing party or counsel.

**PLEASE NOTE THAT UNDER NO CIRCUMSTANCES CAN THE STATE AGREE TO DESIGNATE A SETTLEMENT AGREEMENT AS CONFIDENTIAL. ALL STATE SETTLEMENT RECORDS ARE, BY DEFINITION, PUBLIC DOCUMENTS.**

### H.      Exceptions to Guidelines

It is outside counsel's responsibility to discuss with the Designated Attorney all questions concerning the application of these Guidelines before proceeding on a course of action not specifically authorized by the Guidelines.  The Designated Attorney has authority to modify or waive Guidelines impacting the conduct of a matter, but *not* to modify or waive Guidelines related to billing except as explicitly specified herein.  If an exception to other billing aspects of any Guidelines is deemed necessary by outside counsel, a request must be submitted and approval must be obtained from the Director of the Division of Law or his/her designee.  If the Director has authorized the Designated Attorney to make a billing-related exception beyond the Designated Attorney's normal authority, the Designated Attorney shall affirm that authorization in a writing to the Relationship Attorney, copied to the Director.

The State will not reimburse outside counsel for any fees or expenses incurred in violation of these Guidelines or any exception properly granted in writing.  Only the Director of the Division of Law may orally grant exceptions from these guidelines, and in the event of such oral exception, either the Director or outside counsel should promptly confirm the exception in an email message or other writing.

### I.      Media Relations/Law Firm Advertising

**THE STATE DOES NOT AUTHORIZE OUTSIDE COUNSEL OR VENDORS TO COMMENT PUBLICLY IN ANY MANNER ON ANY ASPECT OF THE STATE'S LEGAL MATTERS.**  All media inquiries relating to the State should be referred promptly to the Designated Attorney and discussed with the Designated Attorney before responding to the media contact in any manner.  This includes even "no comment" or other non-substantive responses.  If time is of the essence and you cannot reach the Designated Attorney, please contact the Director of the Division of Law or the Director of Communications for the Department of Law and Public Safety.

The State does not permit outside counsel to advertise or promote their relationship with the State, other than by listing the State as a representative client.

### J.      Engagement of Secondary Law Firms

Outside counsel may not retain local counsel without the Division's specific prior approval.  During the course of a matter, if it becomes necessary to retain a secondary law firm and/or local counsel, outside counsel will consult with the Designated Attorney and provide recommendations for hiring a firm.  Once retention has been approved, the Designated Attorney will determine if the secondary firm should: (1) be managed by, and invoices passed through outside counsel; or (2) register in CounselLink so that it may invoice the Division directly.  **Local counsel must agree to have their fees and expenses governed by these Guidelines, and the Division will not reimburse local counsel fees and expenses that are inconsistent with these Guidelines.**  The Division may request local counsel's full invoices to ensure compliance.

**K.     Engagement of E-Discovery and Other Vendors, Including Experts**

Before engaging any vendor the costs of which may exceed two thousand dollars ($2,000), including court reporting services, electronic discovery firms and experts, lobbyists or other consultants (in each case, a "vendor"), outside counsel must pre-clear that engagement with the Designated Attorney, unless the Designated Attorney has explicitly granted exceptions to this preclearance requirement. **THE STATE WILL NOT BE RESPONSIBLE FOR MORE THAN $2,000 IN VENDOR FEES OR COSTS UNLESS THAT VENDOR'S ENGAGEMENT WAS PRE-APPROVED BY THE DIVISION.** The Division may require outside counsel to engage vendors with which the State has master contracts or preferred pricing arrangements, and always will insist on engagement of the lowest-cost vendor qualified to handle a task (understanding that complex tasks may require vendors with specialized expertise). Outside counsel and the Designated Attorney shall discuss and agree as to whether particular vendor costs should be included on outside counsel's invoices or billed directly to the Division.

Outside counsel has the responsibility to ensure that there are no conflicts between any vendor and the State. In addition, all vendors must execute the confidentiality agreement attached as Appendix B. The fee and disbursement policies as outlined in these Guidelines shall be made available to, and followed by vendors. It is outside counsel's responsibility to confirm that all third party billings comply with these Guidelines.

Vendor payment arrangements should be discussed in advance with the Designated Attorney. In general, the Division expects outside counsel to contract with vendors themselves and to pay the third party invoices directly, incorporating those invoices into their own bills to the State and including appropriate detail for reasonable review by Division personnel. The Division may request outside counsel to provide full copies of vendor invoices; outside counsel therefore should retain those invoices in accordance with IRS guidelines. The Designated Attorney may approve other payment arrangements, including (in rare cases) direct contracting with and payment by the State.

When engaging court reporting services, outside counsel should request only one transcript (electronic or hard copy). The Division will not reimburse charges for additional transcripts. Please note that the Division has discount contracts with certain reporting services.

**L.     Adherence to Ethical Standards**

The State conducts itself in accordance with the highest ethical standards and expects the same of its outside counsel. No State employee ever has authority to instruct outside counsel to act in an unethical manner. If outside counsel believes that a State employee has engaged or will engage in illegal or unethical activity, the Relationship Attorney must immediately advise the Designated Attorney or, if the alleged breach involves the Designated Attorney, advise his/or her supervisor or the Director of the Division of Law. The Division will terminate its relationship with any outside counsel who, in the Division's sole discretion, fails to adhere to the foregoing ethical standards.

### M.    Malpractice Insurance

Outside counsel representing the State are expected to maintain malpractice insurance coverage that is reasonable and prudent in relation to the types and sizes of matters handled. Outside counsel shall, upon request, promptly provide the Designated Attorney with copies of any applicable policies required under this section, and/or a certificate of insurance.  Each policy provided must be certified by the agent or underwriter to be a true copy.  If outside counsel does not have coverage or if coverage is cancelled and not immediately replaced with comparable coverage, outside counsel must immediately report this to the Designated Attorney.

### N.    File Retention

For Litigated Matters:  Outside counsel shall retain pleadings, correspondence, discovery materials, deposition transcripts and similar documents and work product for a period of no less than seven (7) years from the date the matter is concluded or for the time period specified by rule or law in the jurisdiction in which the matter was pending, whichever is longer.  Beyond this period, outside counsel shall notify the Division in writing no less than sixty (60) days prior to destroying any file.  Along with the written notification, outside counsel shall submit an inventory of any original State documents contained in the file to be destroyed and a representation that any electronic version of the file will also be destroyed or deleted.

For Bond and Other Transactions, and Advice Matters:  Documents shall be retained in accordance with the same policies applicable to litigated matters unless applicable law mandates any longer retention schedule.  However, bond counsel and transactional/advice counsel shall retain all transcripts of transactions and memoranda of advice indefinitely unless otherwise directed by the Designated Attorney.

## V.    CONFIDENTIALITY

In the course of representing the State, outside attorneys frequently gain access to nonpublic and confidential information.  The State requires outside counsel to maintain the confidentiality of such information both during and after the course of the firm's representation of the State.  Outside counsel must have in place appropriate procedures to ensure the protection of all such information. In the event the representation requires outside counsel to become privy to protected personally-identifiable information about any person, such as health or financial records, Social Security numbers or other such information, then this information must be handled with the utmost care both within facilities in outside counsel's control, and certainly when that information is being transported.  Under no circumstances should such confidential information be transported outside your offices--either physically or over the public internet--unless the information is appropriately encrypted.  In the event information is compromised or potentially compromised, outside counsel must notify the Division immediately.

Outside counsel must follow all statutory, regulatory, and ethical provisions relating to privacy, confidentiality and nondisclosure of all privileged, proprietary and confidential information.  Outside counsel must take appropriate measures to ensure that all legal and non-legal personnel are familiar with this requirement and are effectively supervised in this regard.

15

Vendors to whom outside counsel give access to confidential or proprietary material of the State (including work product) must sign the confidentiality agreement attached as Appendix B, as noted above.  It is the responsibility of outside counsel to obtain a signed confidentiality agreement from each vendor and to retain those agreements.

## VI.    INVOICING POLICY

All invoices must be submitted using CounselLink.  CounselLink is compatible with the majority of legal time and billing systems and there is no charge or fee to outside counsel for submitting invoices via CounselLink.  Consult Appendix C – 'Using CounselLink' – for details on how to properly format your invoices.  With each invoice, outside counsel also must complete and submit the State of New Jersey's Payment Voucher (attached as Appendix D).  The Payment Voucher must be uploaded to the matter using the 'Document Attachment' feature in CounselLink (Appendix A).

For litigation, advice, and non-bond transactional matters, outside counsel generally are expected to submit monthly invoices within thirty days of the conclusion of the billing period, absent the Division's prior consent to a longer delay.  All charges must reflect the work performed within the billing period or a reasonable time before the billing period.  Absent good cause, as defined by the Division, the State will not pay for services or expenses incurred more than 90 days prior to the date the invoice is submitted.  For bond matters, outside counsel are expected to submit their invoice within thirty days of the conclusion of the transaction.

Absent a specific agreement to an alternative fee arrangement, outside counsel fees shall be computed by applying the negotiated hourly rate to the time for the services expended.  Hours shown must accurately reflect the time spent on the described activity and must either be the exact amount of time or the exact time rounded down to the nearest one-tenth of an hour.  Block billing—grouping multiple activities under a single time charge—will not be accepted, and the State will not pay for any time recorded in a block fashion unless this requirement is waived by the Director of the Division of Law or his or her designee.

Every bill from outside counsel is deemed to be a certification by the firm and billing partner that all legal services and disbursements reflected on the bill are reasonable for the legal matter involved and necessary for the proper provision of legal services to the State.  CounselLink will automatically deduct certain fees and charges that are inconsistent with these Guidelines.  Every invoice then will be reviewed by the Designated Attorney and, in most cases, by an Assistant Attorney General.  These reviewers may apply additional deductions for charges they deem to be inconsistent with these Guidelines or otherwise inappropriate.  The process of appealing from these deductions is discussed below in Section VI.B.

The State reserves the right to audit all fee and disbursement details that outside counsel submit, as well as the corresponding legal file.  The Division may perform this audit.

The State will promptly terminate the services of any outside counsel whose billing practices raise questions about the outside counsel's integrity, honesty or compliance with the applicable rules of professional conduct or these Guidelines.

## A.     Invoice Format

Each invoice will include the following minimum requirements:

- Unique invoice number
- Invoice date
- Matter name
- Division of Law's matter number
- Outside counsel's matter number
- Date(s) services were performed
- Timekeeper name or ID
- Timekeeper title or level
- A narrative description of the services provided or tasks performed for each specific task. The description should clearly state the nature of the task performed sufficient to allow the Division to determine why it was necessary. Incomplete or vague charge descriptions are unacceptable. Examples of incomplete or vague charges include, but are not limited to: 'analysis', 'review file,' 'conference', 'attention to matter'; 'worked on discovery', 'work on file', 'prepare for meeting', 'misc.', and 'other'.
- Time entry to the nearest tenth (.10) of an hour
- Timekeeper rate
- Charge total
- Detail of reimbursable expenses and disbursements at actual cost

The detailed billing report from your computerized billing system will provide this information.  If your firm provides services on more than one matter during a billing period, a separate invoice for each matter is required.  Please refer to Appendix C - 'Using CounselLink' - for more specifics.

## B.     Appealing From Deductions

If CounselLink automatically deducts fees or charges and/or the Division applies deductions manually after reviewing an invoice, the invoice will be returned to outside counsel's queue for their review of these deductions.  If outside counsel wishes to discuss and potentially to ask the Division to reconsider deductions, they may do so within 30 calendar days from the date on which the invoice is returned to their queue by contacting the Assistant Attorney General noted on the bill as having approved the deductions.  On the 31st day after a reduced invoice is returned to outside counsel's queue, the Division will consider the deductions final.

Where the Division and outside counsel discuss deductions, outside counsel will be asked, once the discussion has concluded, to resubmit a new invoice and Payment Voucher reflecting the agreed amounts.  Although the Division will discuss deductions with outside counsel and give due consideration to outside counsel's views, the Division's determinations with respect to deductions are final and the Division reserves the right to modify previously submitted Payment Vouchers to reflect the reduced amount if outside counsel do not appeal deductions or do not timely submit a new Payment Voucher reflecting them.

17

## VII.   GRATUITIES

State officers and employees are prohibited from accepting any gift, favor, service or other thing of value related in any way to the State officer's or employee's public duties.   In addition, Executive Order No. 189, signed by Governor Kean, prohibits any vendor to the State from offering a gift or other thing of value to a State officer or employee or special State officer in an agency with which the vendor transacts business or offers to transact business.   This Executive Order also prohibits any State officer or employee from soliciting a gift or thing of value from a State vendor.   This includes charitable donations made in the name of a State employee.

APPENDIX A
## DOCUMENT ATTACHMENT

Law firms are able to attach case supporting documents such as pleadings, status reports and third-party invoices electronically to either an invoice or a matter. Outside counsel may be requested to upload specific documents to a matter or invoice. Documents will be permanently attached to the invoice or matter unless removed by the individual who attached them. Only the law firm and Client will be able to view the documents. Most document formats are accepted including PDF files.

**PLEASE DO NOT USE DOCUMENT ATTACHMENT TO SUBMIT LAW FIRM INVOICES.**

**Attaching a document to an Invoice (e.g., expense receipts)**
- Log in to http://www.counsellink.net
- From the Home page, click on either **Created** or **Scheduled** Invoices (dependent upon the status of your invoice)
- Click on the **CounselLink Invoice Number**
- To add or search for a document , click on the **Documents** link
- To add a document, click on the **Add Document** link
- Type in the document name as you want it to appear in CounselLink
- Browse your file directory for the document to add by clicking the **Browse** button
- Select the **Category** from the drop down
- Select "**Yes**" from the **Shared** drop down
- Select "**Public**" from the **Access Level** drop down
- Enter a free form description of the document in the **Description** box
- Enter a key word to assist in future searches in the **Key Word** box
- Click on **Save**

**Attaching a document to a Matter (e.g., Initial Report, pleadings, summaries)**
- Log in to http://www.counsellink.net
- From the Home page, click on **Matter Search**
- Enter the **Matter Search** criteria
- Click on the **Matter ID** or **Matter Title**
- Select **Documents** from the **Action** drop down
- Type in the document name as you want it to appear in CounselLink
- Browse your file directory for the document to add by clicking the **Browse** button
- Select the **Category** from the drop down
- Select "**Yes**" from the **Shared** drop down
- Select "**Public**" from the **Access Level** drop down
- Enter a free form description of the document in the **Description** box
- Enter a key word to assist in future searches in the **Key Word** box
- Click on **Save**

**APPENDIX B**
**CONFIDENTIALITY AGREEMENT**

## CONFIDENTIALITY AGREEMENT

_____ (Subcontractor), as a contractor of the law firm retained by the State of New Jersey, hereby acknowledges and agrees as follows:

1.  All documents and data, including but not limited to financial, statistical, personnel, customer and/or technical documents, owned or supplied by the State to the Subcontractor, shall be treated as confidential (Documents and Data).  The Subcontractor shall take all necessary and reasonable precautions to ensure that the State's Documents and Data are safeguarded.  Use of the Documents and Data is strictly limited to that use necessary to complete the scope of work agreed upon, which may include disclosure to employees, officers or agents of any subcontractor assisting with the scope of work.  Any other use, and any sale or offering of the Documents and Data in any form by the Subcontractor, or any individual or entity in the Subcontractor's charge or employ, will be considered a violation of this Confidentiality Agreement and may result in ermination of the agreement between Subcontractor and the law firm retained by the State, and the Subcontractor's suspension or debarment from State contracting.  In addition, such conduct may be reported to the State Attorney General for possible criminal prosecution.

2.  Subcontractor shall be responsible to ensure that all agents and individuals or entities in the Subcontractor's charge or employ adhere to this Confidentiality Agreement.  A breach of confidentiality by any individual or entity in the Subcontractor's charge or employ will be considered a violation of this Confidentiality Agreement by the Subcontractor.

3.  In the event that Subcontractor, its agent or any individual or entity in the Subcontractor's charge or employ receives a subpoena, demand, or other request for any of the State's documents or data, Subcontractor shall promptly notify the State and shall not turn over any of the State's documents or data.

4.  The Subcontractor shall comply with all applicable State and Federal laws that require the notification of individuals in the event of unauthorized release of personally-identifiable information or other event requiring notification. In the event of a breach of any of the Subcontractor's confidentiality obligations or other event requiring notification under applicable law ("Notification Event"), the Subcontractor agrees to assume responsibility for informing all such individuals in accordance with applicable law and to indemnify, hold harmless and defend the State of New Jersey and its trustees, officers, and employees from and against any claims, damages, or other harm related to such Notification Event.

5.  Upon termination of this Confidentiality Agreement the Subcontractor shall return or erase, destroy, and render unreadable all Subcontractor copies of State Documents and Data, both physical and electronic, and certify in writing that these actions have been completed within 30 days of the termination of this Confidentiality Agreement or within 14 days of the request of an agent of the State, whichever shall come first.

6.  This Confidentiality Agreement shall terminate upon the Subcontractor's termination of the contract between the law firm retained by the State and Subcontractor or upon completion of the scope of work related to the State.

Firm _____

By _____

Title _____

Date _____

**APPENDIX C**
**USING COUNSELLINK**

*Budgeting*

**Please utilize the Budget feature within CounselLink to expedite approval of your proposed budget.**

*Staffing*

**Please utilize the Staffing List feature within CounselLink to expedite approval of your staffing proposal.**

*Invoice Submissions*

To secure prompt and accurate payments to your firm, invoices in structured data format (LEDES) submitted via the web site www.counsellink.net are preferred. When necessary, we will accept invoices, in other formats, including e-mailing a .PDF or ASCII invoice, mailing a diskette or mailing a white paper invoice.

**Submission of a Structured Data File to CounselLink**

- Export the invoice to the LEDES (ASCII) structured data format
- Log into www.counsellink.net using your assigned login and password
- Click on the Upload Invoice link on the law firm home page
- Browse to the saved LEDES invoice, select it and click "Open"
- Complete any other necessary information on the Invoice Submission page and click "Submit File"

**Creating an Invoice in CounselLink (U.S. currency only)**

- Log into www.counsellink.net using the provided login and password
- Click on the Matter Search link on the law firm home page
- Search for the matter on which the invoice is to be submitted
- Select "Create Invoice" from the Action bar dropdown
- Enter information on the "Edit Invoice Screen" if applicable and click on Submit
- Enter fees and expenses from the invoice screen
- Submit invoice

**Alternative Forms of Submission**

**Email:** A .PDF file or ASCII format copy of the invoice may be submitted via email to dept165@examen.com.  Submit only ONE INVOICE PER .PDF file, although multiple .PDF files may be attached to a single email.
**Diskette:** A diskette in ASCII format.
**Paper:** An original copy of an invoice on white paper.  If submitting paper invoices, a separate invoice must be submitted for each matter.  When submitting invoices for multiple matters at one time, each invoice must begin on a new sheet of paper and must have a unique numerical identifier.  Unique invoice numbers for individual matters may be created by adding a suffix to the invoice number created by your system (e.g., 12345-1, 12345-2, 12345-3, etc.)
Diskettes and paper invoices should be sent to New Jersey Department of Law c/o LexisNexis Examen, Inc., Attn: CounselLink Invoices, 1801 Varsity Dr., Raleigh, NC  27606

**Invoice Returns**

Invoices and the charges they reflect that in all respects conform to this Policy will be promptly processed for payment.  Invoices or charges that do not conform to this Policy may be returned to your firm, in whole or in part, for correction. Invoices may also be returned for the following reasons:

- Uploaded invoice is not in the LEDES format
- Invoice contains a math error
- Invoice contains block billed charges
- No invoice number
- Duplicate invoice number
- Invoice does not contain a date
- Invoice date is in the future
- Invoice is an exact duplicate of previous invoice
- Charges do not contain a date
- Time increments not in tenths of an hour
- Unknown or incorrect LF Matter ID
- At Client's discretion

**Block Billing on Invoices**

Invoices should set forth in detail the related professional, the distinct tasks and activities performed by each professional, the time expended in tenths of an hour and fees charged for that work in separate time entries. Additionally, the task description must be sufficiently descriptive in order to identify the facility, location or office involved. Descriptions of blocks, batches of activities or tasks under one charge (i.e., "block-billing") are unacceptable. Invoices that contain any "block" billing entries will be returned.

For example, an invoice containing the following entry will be returned:

| Hours | Description |
|-------|-------------|
| 1.5 | Reviewed plaintiff's interrogatory responses; prepared letter to opposing counsel regarding settlement options; continue drafting motion for summary judgment. |

An acceptable method to enter the time entry would be:

| Hours | Description |
|-------|-------------|
| 1.5 | Reviewed plaintiff's interrogatory responses (.3); prepared letter to opposing counsel regarding settlement options (.4); continue drafting motion for summary judgment (.8). |

**CounselLink Customer Support**
CounselLink technical expertise is available to our outside counsel at no cost. For technical support, please contact LexisNexis Examen's Customer Support Department at 800-600-2282, option 2, then 1. If outside the United States, please contact +1-916-679-3899.

**APPENDIX D**
**PAYMENT VOUCHER**

| STATE OF NEW JERSEY **PAYMENT VOUCHER** (VENDOR INVOICE) | | DOCUMENT | | | BATCH | | | ACTG PER | FY |
|---|---|---|---|---|---|---|---|---|---|
| | | TC | AGY | NUMBER | TC | AGY | NUMBER | | |

PO#   ———PV DATE———

| | PP START | | | SCHED PAY | | | CHK CAT | OFF LIAB | F A | RF TY | CK FL | (A) VENDOR ID NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | MO | DY | YR | MO | DY | YR | | | | | | |

| CONTRACT NO. | AGENCY REF | BUYER | (B) TERMS | PAYEE: | SEE INSTRUCTIONS FOR COMPLETING ITEMS (A) THROUGH (G) | (C) TOTAL AMOUNT |
|---|---|---|---|---|---|---|
| | | | | | | |

| (D) PAYEE NAME AND ADDRESS | (E) SEND COMPLETED FORM TO: |
|---|---|
| | |

**(F)   PAYEE DECLARATIONS**
CERTIFY THAT THE WITHIN PAYMENT VOUCHER IS CORRECT IN ALL ITS PARTICULARS THAT THE DESCRIBED GOOD OR SERVICE HAVE BEEN FURNISHED OR RENDERED AN THAT NO BONUS HAS BEEN GIVEN OR RECEIVED ON ACCOUNT OF SAID DOCUMENT.

............................................................
PAYEE SIGNATURE

............................................................
PAYEE TITLE            BILLING DATE

**REFERENCE** | | | | **(G) PAYEE REFERENCE**

| DC | AGY | NUMBER | LINE |
|---|---|---|---|
| | | | |
| | | | |

| FUND | AGCY | ORG CODE | SUB-ORG | APPR UNIT | ACTIVITY CD | OBJECT CD | SUB-OBJ | REV SRCE | SUB-REV | PROJECT NO |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

| RPT | BS ACT | DT | DESCRIPTION | QUANTITY | AMOUNT | ID | PF | TX |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |

| ITEM NO | COMMODITY CODE / DESCRIPTION OF ITEM | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | | | | |

| CERTIFICATION BY RECEIVING AGENCY: I certify that the above article have been received or services rendered as stated herein. | CERTIFICATION BY RECEIVING AGENCY: I certify that this Payment Voucher is correct and just, and payments is approved. |
|---|---|
| ........................................................ Signature | ........................................................ Authorized Signature |
| ............................ Title        ............................ Date | ............................ Title        ............................ Date |

PV 6/93

# EXHIBIT 7

Table 1

| Witnesses interviewed on more than one occasion and/or by 3 or more Gibson Dunn Attorneys | | |
| --- | --- | --- |
| **Witness** | **Date(s) Interviewed** | **Gibson Dunn Attorneys Present** |
| Terry Brody | January 28th | Brodsky/Brook/Hudson |
| Michele Brown | January 30th | Southwell/Vacchiano/Yang |
| Chris Christie | February 12th | Mastro/Yang/Southwell |
| | February 28th | |
| | March 18th | |
| Rich Constable | January 25th | Mastro/Southwell/Vacchiano/Brodsky |
| | February 9th | |
| Nicole Crifo | January 21st | Southwell/Yang/Vacchiano |
| | February 15th | |
| Tim Cunningham | January 28th | Brodsky/Brook/Hudson |
| Luciana DiMaggio | January 23rd | Mastro/Brodsky/Brook/Kuhn |
| | January 27th | |
| | March 10th | |
| Matthew Doherty | January 28th | Mastro/Narasimhan/Vacchiano |
| | February 13th | |
| | March 24th | |
| | April 8th | |
| Michael Drewniak | January 19th | Mastro/Southwell/Yang/Weitzman/Kushner |
| | March 10th | |
| | March 22nd | |
| Mike DuHaime | March 11th | Mastro/Vacchiano |
| | March 13th | |
| Regina Egea | January 17th | Southwell/Vacchiano |
| | February 6th | |

| Name | Date | Attendees |
|------|------|-----------|
| Marc Ferzan | February 19th | |
| | January 22nd | Mastro/Southwell/Yang/Brook/Kushner/Kuhn |
| | January 23rd | |
| | January 27th | |
| | February 18th | |
| | March 23rd | |
| Deb Gramiccioni | January 17th | Southwell/Yang/Vacchiano |
| | February 24th | |
| Kim Guadagno | January 22nd | Mastro/Yang/Southwell/Brodsky/Kushner |
| | January 27th | |
| Judy Larkin | January 27th | Mastro/Brodsky/Kuhn |
| Robert Martin | January 28th | Brodsky/Brook/Hudson |
| | January 31st | |
| Matthew McDermott | March 19th | Brodsky/Benjamin/Kuhn |
| | March 20th | |
| Charles McKenna | January 22nd | Mastro/Yang/Southwell/Kushner |
| | March 12th | |
| David Morris | January 23rd | Mastro/Brook/Brodsky/Kuhn |
| Matthew Mowers | February 10th | Southwell/Weitzman/Kushner |
| John Moyle | February 19th | Brodsky/Weitzman/Kuhn |
| | March 11th | |
| Thomas Neff | January 29th | Weitzman/Brook/Hudson |
| Kevin O'Dowd | January 19th | Mastro/Southwell/Yang/Kushner |
| | March 8th | |
| Melissa Orsen | January 23rd | Mastro/Southwell/Brodsky/Brook/Kushner/Kuhn |
| | January 27th | |
| | February 12th | |
| | February 18th | |
| David Reiner | January 28th | Brodsky/Brook/Hudson |
| Christina Renna | January 30th | Mastro/Yang/Southwell/Vacchiano |
| Evan Ridley | January 23rd | Mastro/Brodsky/Weitzman/Benjamin/Brook/Kuhn |
| | March 11th | |
| | March 21st | |

| Lisa Ryan | January 28th | Brodsky/Brook/Hudson |
| Kieran Tintle | February 12th | Southwell/Yang/Kushner |
| Arif Welcher | January 28th | Brodsky/Brook/Hudson |
| David Zimmer | March 11th | Weitzman/Kuhn |
| | March 27th | |

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:       Brody Interview Memorandum

_____

On January 28, 2014, Terrence Brody was interviewed by Reed Brodsky, Rachel Brook, and Christian Hudson of Gibson Dunn. Brody was not represented by counsel during the interview. All information contained herein was provided by Brody or as indicated. Brody has not read or reviewed the memorandum and has not adopted or approved its contents. Brodsky began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Brody refrain from discussing the investigation and interview with others. Brody stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.        Background

In 2000, Brody graduated from the University of Scranton. In 2003, he graduated from the University of Rutgers Law School (Newark). He clerked for a year in the Chancery Division of the New Jersey Courts. He spent seven years in private practice, first with Gibbons P.C. in Newark, practicing commercial litigation and internal investigations, and then, in 2008, with Greenberg Traurig in their New Jersey office, where he was an associate. In May 2010, Brody joined the New Jersey Office of the Attorney General as a Special Assistant to the Attorney General. He then worked his way up to Chief of Staff for the Attorney General. As Chief of Staff, he was part of a four-person team overseeing 8,600 employees in ten divisions. His primary responsibility was civil litigation, and he was not involved in criminal investigations.

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:       Brown Interview Memorandum

---

On January 30, 2014, Michele Brown was interviewed by Alexander H. Southwell, Debra Wong Yang and Sarah Vacchiano of Gibson Dunn. Brown was not represented by counsel during the interview. All information contained herein was provided by Brown or as indicated. The information in brackets was obtained from publicly-available sources, not from the interview itself. Brown has not read or reviewed the memorandum and has not adopted or approved its contents. Southwell began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Brown refrain from discussing the investigation and interview with others. Brown stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

I.        **Background**

[*Brown received a B.A., magna cum laude, from Drew University and a law degree, magna cum laude, from Georgetown University Law Center. Prior to serving in her current role as Chief Executive Officer of the New Jersey Economic Development Authority ("EDA"), Brown served as Appointments Counsel for Governor Christie. Brown also served as a federal prosecutor and Acting First Assistant United States Attorney for the District of New Jersey. Brown was appointed CEO of the Economic Development Authority in October 2012.*]

A.        **Role and Responsibilities**

Brown left the Governor's Office in October 2012 to join EDA right before Superstorm Sandy hit on October 29, 2012. Brown remarked that her role at EDA changed dramatically after Superstorm Sandy. Prior to Sandy, Brown oversaw a staff of about 140

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:       Governor Christie Interview Memorandum

_____

On February 12, 2014, February 28, 2014, and March 18, 2014, Governor Chris
Christie was interviewed by Randy Mastro, Debra Wong Yang, and Alexander H. Southwell
of Gibson Dunn.  The Governor was not represented by counsel and volunteered to make
himself available to be interviewed.  All information contained herein was provided by
Governor Christie.  Governor Christie has not read or reviewed the memorandum and has not
adopted or approved its contents.

This memorandum does not contain a verbatim transcript of what was said at the
meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and
impressions and is therefore protected from disclosure by the attorney work product doctrine.

I.        **Allegations concerning Sandy Aid and Mayor Zimmer**

In response to questions about the Governor's Administration's focus on Sandy aid,
Governor Christie explained that he established a separate office—the Governor's Office of
Recovery and Rebuilding, referred to as GORR—within his Office to coordinate Sandy aid.
He established GORR to help administer aid in an orderly and responsive manner.  The
process of funding reimbursements is complicated and needed a dedicated staff.
Specifically, the Office was tasked with handling requests for Sandy aid and the extensive
federal and state oversight of Sandy aid, including integrity audits.  The Governor's charge to
those who worked on the Sandy aid response was that because there were lots of different
sources of aid, aid should be distributed quickly and efficiently to the people who need it.
The Governor established weekly meetings in order to help those in need to access available
funds.  He hired Marc Ferzan, a former federal prosecutor, to head up GORR because he was
a very effective, "by the book" guy.  The Governor commented that he was confident that
Ferzan would not be overwhelmed or frustrated by the task at hand, which was
extraordinarily complex.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:     File

From:   Gibson, Dunn & Crutcher LLP

Re:     Constable Interview Memorandum

On January 25, 2014, and February 9, 2014, Richard Constable was interviewed by Randy M. Mastro, Alexander H. Southwell, Reed Brodsky and/or Sarah Vacchiano of Gibson Dunn. Constable was represented by Brian Neary of the Law Offices of Brian J. Neary. All information contained herein was provided by Constable or as indicated. Constable has not read or reviewed the memorandum and has not adopted or approved its contents. Mastro began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Constable refrain from discussing the investigation and interview with others. Constable stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.    Background

Constable grew up in East Orange, New Jersey. He attended Seton Hall Preparatory School for high school. In 1994, Constable graduated from the University of Michigan. In 1997, Constable graduated with a law degree and a Master's degree in Public Administration from the University of Pennsylvania. Constable completed both graduate degrees in three years.

Constable clerked for one year for Justice Alan C. Page of the Minnesota Supreme Court, and then worked as a litigation associate at Sullivan & Cromwell in New York, New York for four years. At Sullivan & Cromwell, Constable worked on matters handled by several litigation practice groups, including securities and employment litigation.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:       File

From:     Gibson, Dunn & Crutcher LLP

Re:       Crifo Interview Memorandum

---

On January 21, 2014, and February 15, 2014, Nicole Crifo was interviewed by Alexander H. Southwell, Debra Wong Yang and Sarah Vacchiano of Gibson Dunn. Crifo was not represented by counsel during the interview. All information contained herein was provided by Crifo or as indicated. The information in brackets was obtained from publicly-available sources, not from the interview itself. Crifo has not read or reviewed the memorandum and has not adopted or approved its contents. Southwell began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Crifo refrain from discussing the investigation and interview with others. Crifo stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.   Background

[*Crifo attended College of the Holy Cross and Rutgers University School of Law. Following law school, she clerked in the Appellate Division before joining Lowenstein Sandler in Roseland, New Jersey.*]

Crifo joined the Authorities Unit as Assistant Counsel on or about April 28, 2011. She was promoted to Senior Counsel around July or August 2012. Crifo left the Authorities Unit on or about January 10, 2014, to serve as Deb Gramiccioni's Chief of Staff at the Port Authority.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:       File

From:    Gibson, Dunn & Crutcher LLP

Re:       Cunningham Interview Memorandum

_____

On January 28, 2014, Timothy Cunningham was interviewed by Reed Brodsky, Rachel Brook, and Christian Hudson of Gibson Dunn. Cunningham was not represented by counsel during the interview. All information contained herein was provided by Cunningham or as indicated. Cunningham has not read or reviewed the memorandum and has not adopted or approved its contents. Brodsky began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Cunningham refrain from discussing the investigation and interview with others. Cunningham stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.       Background

Cunningham is originally from Trenton, New Jersey. In 1994, he graduated from Lawrence University with a bachelor's degree in accounting. In 1996, he obtained an MBA degree from Rider University. After graduating, Cunningham worked in accounting positions in the telecom industry. In approximately 1998, he began working in the Criminal Authority of Mercer County, where he worked for several years. Cunningham then began attending the night program at Rutgers School of Law – Camden, obtaining his J.D. in four years. During his third and fourth years of law school, he worked as a law clerk doing municipal debt work. Cunningham continued working at this job after graduating law school, working there for a total of three years. He was then appointed to be the Deputy County Administrator of Passaic County, where he was responsible for the day-to-day operations of an approximately $400 million budget and approximately 1,800 employees. In this position, Cunningham also ran the jail, hospital, finances, human resources, and purchasing tasks.

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:        DiMaggio Interview Memorandum

On January 23, 2014, January 27, 2014, and March 10, 2014, Luciana DiMaggio was interviewed by Randy M. Mastro, Reed Brodsky, Rachel Brook, and/or Alyssa Kuhn of Gibson Dunn.  On January 23 and 27, 2014, DiMaggio was not represented by counsel.  On March 10, 2014, DiMaggio was represented by Michael Buchanan of Patterson Belknap.  All information contained herein was provided by DiMaggio or as indicated.  DiMaggio has not read or reviewed this memorandum and has not adopted or approved its contents.  Brodsky began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that DiMaggio refrain from discussing the investigation and interview with others.  DiMaggio stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.        Background

In 2012, DiMaggio graduated from Fairleigh Dickinson University.  DiMaggio interned for a New Jersey Assemblywoman in District 11 the summer before her senior year at Fairleigh Dickinson, and served as the Assemblywoman's Communications Director during her senior year.  In early 2012, DiMaggio was recommended for her current position at the Lieutenant Governor's Office.  Approximately one month after graduating from Fairleigh Dickinson, DiMaggio started working as a special assistant or aide to the Lieutenant Governor.  DiMaggio is a registered Republican.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:     Gibson, Dunn & Crutcher LLP

Re:       Doherty Interview Memorandum

_____

This memorandum memorializes phone calls to Mayor Matthew Doherty of Belmar on January 28, 2014, February 13, 2014, March 24, 2014, and April 8, 2014 by Randy Mastro, Sripriya Narasimhan, and/or Sarah Vacchiano of Gibson Dunn. Mayor Doherty was not represented by counsel at any of these times. Mayor Doherty has not been given a copy of this memorandum to review. All information contained herein was obtained from Mayor Doherty or as indicated.

The following contains Mayor Doherty's biographical information as background, gathered from publicly available sources: Mayor Doherty is a Democrat elected in the town of Belmar, New Jersey. He earned a Bachelor's and Master's degree in Public Policy from Georgetown University. Doherty currently holds the position of Financial Advisor with Investors Bank, a community bank headquartered in New Jersey. He is married and has two daughters.

At the outset of the call on January 28, 2014, Mastro introduced Gibson Dunn and informed Doherty that Gibson Dunn is conducting an internal review for Governor Chris Christie's office concerning the recent allegations made by Mayor Dawn Zimmer of Hoboken. Mastro told Doherty that the primary objective of the phone call was to determine the facts and then report back to the Governor's Office on our findings to assist that office in addressing any issues relating to these allegations.

Doherty stated that he attended the New Jersey TV town hall meeting on May 16, 2013, with others involved in Sandy recovery, including Mayor Zimmer and Commissioner Constable. Doherty explained that he was seated next to Zimmer and Constable in the front row. Doherty explained that the entire group was gathered in the green room until shortly before the beginning of the televised broadcast. They left the green room and mingled on stage, and then were seated a few minutes before the beginning of the broadcast, at which

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

## PRIVILEGED AND CONFIDENTIAL
## ATTORNEY OPINION WORK PRODUCT

To:       File

From:     Gibson, Dunn & Crutcher LLP

Re:       Drewniak Interview Memorandum

---

On January 19, 2014, March 10, 2014, and March 22, 2014, Michael Drewniak was interviewed by Randy M. Mastro, Alexander H. Southwell, Debra Wong Yang, Avi Weitzman, and/or Sarah L. Kushner of Gibson Dunn. On January 19, 2014, Drewniak was not represented by counsel. On March 10 and 22, 2014, Drewniak was represented by Anthony Iacullo and Joshua Reinitz of Iacullo Martino. All information contained herein was provided by Drewniak or as indicated. Drewniak has not read or reviewed the memorandum and has not adopted or approved its contents. Southwell began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Drewniak refrain from discussing the investigation and interview with others. Drewniak stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.    Background

### A.    Role and Responsibilities

Drewniak was the Public Information Officer at the U.S. Attorney's Office for the District of New Jersey (the "U.S. Attorney's Office") from approximately October 1998 until 2010, where he worked under three different U.S. Attorneys. Drewniak did not interact with the Port Authority of New York & New Jersey (the "Port Authority") while at the U.S. Attorney's Office. In 2010, Drewniak became Press Secretary in the Governor's Office. Drewniak described his responsibilities as Press Secretary as follows:  he takes incoming questions from reporters or legislators and then "chases down" the relevant people in the Office to declare the answer. Drewniak said that he tended to respond to a lot of these

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:         File

From:    Gibson, Dunn & Crutcher LLP

Re:        DuHaime Interview Memorandum

On March 11, 2014, and March 13, 2014, Mike DuHaime was interviewed by Randy M. Mastro and Sarah Vacchiano of Gibson Dunn.  DuHaime was represented by counsel Marc Mukasey during both interviews.  All information contained herein was provided by DuHaime or as indicated.  The information in brackets was obtained from publicly-available sources, not from the interview itself.  DuHaime has not read or reviewed the memorandum and has not adopted or approved its contents.  Mastro began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that DuHaime refrain from discussing the investigation and interview with others.  DuHaime stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.        Background

[*DuHaime graduated from Rutgers University with a B.A. in journalism and political science.*]

### A.        Relationship with Governor Chris Christie

DuHaime's relationship with Governor Christie dates back to 1997, when DuHaime was working on a New Jersey state senate campaign at the same time that Governor Christie was running for re-election as Morris County freeholder.  DuHaime got to know the Governor at that time and they stayed in touch through the years.

On January 1, 2009, DuHaime started working at Mercury Public Affairs, and also started working for Governor Christie when the Governor retained DuHaime's consulting firm, Mercury Public Affairs, to consult for the gubernatorial campaign.  The Governor hired Mercury again in 2013 for Governor Christie's re-election campaign.  DuHaime worked as a strategist on both of

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

## Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:     Gibson, Dunn & Crutcher LLP

Re:        Egea Interview Memorandum

On January 17, 2014, February 6, 2014, and February 19, 2014, Regina Egea was
interviewed by Alexander H. Southwell and Sarah Vacchiano of Gibson Dunn. Egea was not
represented by counsel during the interviews. All information contained herein was provided by
Egea or as indicated. The information in brackets was obtained from publicly-available sources,
not from the interview itself. Egea has not read or reviewed the memorandum and has not
adopted or approved its contents. Southwell began the interview by administering the standard
*Upjohn* warnings per Gibson Dunn protocol, and requesting that Egea refrain from discussing the
investigation and interview with others. Egea stated that she agreed, understood, and did not
have any questions.

This memorandum does not contain a verbatim transcript of what was said at the
meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and
impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.        Background

[*Egea earned a BA from Montclair University in New Jersey and an MBA in Marketing
from Fordham University. She also completed the International Executive Program at the
International Institute for Management Development in Lausanne, Switzerland. Prior to joining
state government, Egea was Senior Vice President for AT&T where she managed a 300-person
team supporting AT&T business sales force. She was elected to local government in Harding
Township (Morris), New Jersey in 2008. Egea left AT&T in 2008 to work for the Christie for
Governor campaign and policy team in 2009.*]

Upon the change in administration, Egea worked for the Policy Office, but only for two
weeks until she was appointed Chief of Staff for the State Treasurer. In February 2012, she was
appointed as Director of the Authorities Unit under Governor Christie. In December 2013, she
was promoted to Chief of Staff, although currently and as a practical matter, Egea noted that
Kevin O'Dowd remains in that role and Egea remains in charge of the Authorities Unit.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY OPINION WORK PRODUCT**

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:        Ferzan Interview Memorandum

On January 22, 2014, January 23, 2014, January 27, 2014, February 18, 2014, and March 23, 2014, Marc Ferzan was interviewed by Randy M. Mastro, Debra Wong Yang, Alexander H. Southwell, Reed Brodsky, Rachel Brook, Sarah L. Kushner, and/or Alyssa Kuhn of Gibson Dunn. On January 22, 2014, January 23, 2014, and January 27, 2014, Ferzan was not represented by counsel. On February 18, 2014, and March 23, 2014, Ferzan was represented by John Carney, Lauren Resnick, George Stamboulidis, and/or Francesca Harker of Baker Hostetler. All information contained herein was provided by Ferzan or as indicated. Ferzan has not read or reviewed the memorandum and has not adopted or approved its contents. Southwell began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Ferzan refrain from discussing the investigation and interview with others. Ferzan stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.        Background

### A.        Role and Responsibilities

Ferzan described how he was appointed the Executive Director of the Governor's Office of Recovery and Rebuilding ("GORR") following Superstorm Sandy. Ferzan explained that, in 2010, when Chris Christie became Governor, Ferzan left the U.S. Attorney's Office for the District of New Jersey (the "USAO") and joined the New Jersey Attorney General's Office as an Executive Assistant Attorney General under Paula Dow. Subsequently, he left the public sector, and joined PricewaterhouseCoopers ("PwC"), where he worked in the company's consulting practice. When Superstorm Sandy hit, Ferzan—a New Jersey resident, who observed first-hand the storm's damage—began talking to Charlie McKenna and Kevin O'Dowd to see if PwC, harnessing its disaster recovery services, experience, and expertise, could assist the Office in establishing an organized approach in responding to New Jersey's short-term and long-term

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:      File

From:    Gibson, Dunn & Crutcher LLP

Re:      Gramiccioni Interview Memorandum

_____

On January 17, 2014, and February 24, 2014, Deborah Gramiccioni was interviewed by Alexander H. Southwell, Debra Wong Yang and/or Sarah Vacchiano of Gibson Dunn. On January 17, 2014, Gramiccioni was not represented by counsel. On February 24, 2014, Gramiccioni was represented by Judy Germano of GermanoLawLLC. All information contained herein was provided by Gramiccioni or as indicated. The information in brackets was obtained from publicly-available sources, not from the interview itself. Gramiccioni has not read or reviewed the memorandum and has not adopted or approved its contents. Southwell began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Gramiccioni refrain from discussing the investigation and interview with others. Gramiccioni stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.      Background

[Gramiccioni attended the University of Pennsylvania and the University of Virginia School of Law. She clerked for the Honorable Alfred J. Lechner (District of New Jersey) before working as an associate at Skadden, Arps, Slate, Meagher & Flom LLP. From 1999-2005, Gramiccioni served as an Assistant United States Attorney with the U.S. Attorney's Office in New Jersey. She left the U.S. Attorney's Office to be Assistant Chief of the Fraud Section in the Criminal Division of the Department of Justice from 2005-2007, then served as Special Assistant to the former Attorney General of New Jersey Anne Milgram from 2007-2008. Directly before joining the Governor's Office, Gramiccioni served as the Director of the Division of Criminal Justice in the New Jersey Attorney General's Office from 2008-2010.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:       File

From:     Gibson, Dunn & Crutcher LLP

Re:       Lieutenant Governor Guadagno Interview Memorandum

On January 22 and 27, 2014, New Jersey Lieutenant Governor Kimberly Guadagno was interviewed by Randy M. Mastro, Debra Wong Yang, Alexander H. Southwell, Reed Brodsky, and/or Sarah L. Kushner of Gibson Dunn.  The Lieutenant Governor was not represented by counsel during the interview.  All information contained herein was provided by the Lieutenant Governor or as indicated.  The Lieutenant Governor has not read or reviewed this memorandum, and has not adopted or approved its contents.  Southwell began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol and requesting that the Lieutenant Governor refrain from discussing the investigation and interview with others.  The Lieutenant Governor stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore covered by the attorney work product doctrine.

## I.      Background

### A.      Role and Responsibilities

Guadagno explained that her job as Lieutenant Governor is focused primarily on promoting business and economic development.  She and her staff have a weekly meeting to discuss economic development projects around the State.  Guadagno is also the Secretary of State of New Jersey.  The Lieutenant Governor's office consists of approximately six staff members.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:       Larkin Interview Memorandum

On January 27, 2014, Judith Larkin was interviewed by Randy M. Mastro, Reed Brodsky, and Alyssa Kuhn of Gibson Dunn.  Larkin was not represented by counsel during the interview.  All information contained herein was provided by Larkin or as indicated.  Larkin has not read or reviewed this memorandum and has not adopted or approved its contents.  Mastro began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol and requesting that Larkin refrain from discussing the investigation and interview with others.  Larkin stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.        Background

Before joining the Office of the Lieutenant Governor in 2010, Larkin worked for a private industry.  At some point, Larkin was a registered Democrat, but is now a registered Republican because she is a strong supporter of the Christie Administration and wanted to vote for the Governor in the Republican primary.  Larkin did not recall if she, in fact, registered in time to vote in the primary.

### A.        Role and Responsibilities

Larkin has been the Lieutenant Governor's Personal Assistant since she joined the Governor's Office in early 2010.  Larkin's responsibilities include keeping the Lieutenant Governor's schedule and organizing her messages.  Larkin noted that she has worked with the Lieutenant Governor for over four years and has never witnessed the Lieutenant Governor do anything Larkin would consider inappropriate.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:      File

From:    Gibson Dunn & Crutcher LLP

Re:      Martin Interview Memorandum

On January 28, 2014, and January 31, 2014, Robert Martin was interviewed by Reed Brodsky, Rachel Brook, and/or Christian Hudson of Gibson Dunn. Martin was not represented by counsel. All information contained herein was provided by Martin or as indicated. The information in brackets was obtained from publicly-available sources, not from the interview itself. Martin has not read or reviewed the memorandum and has not adopted or approved its contents. Brodsky began all interviews by administering the standard *Upjohn* warnings and requesting that Martin refrain from discussing the investigation and interview with others per Gibson Dunn protocol. Martin stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.      Background

[*On January 19, 2010, Martin was appointed by Governor Christie to be Commissioner of the Department of Environmental Protection ("DEP"). Prior to his appointment, Martin was a partner at Accenture LLP, where he worked for over 25 years. He received a bachelor of arts in Economics and Sociology from Boston College in 1979, and an MBA from George Washington University in 1982.*]

## II.     Superstorm Sandy Aid Allegations

### A.     March 5, 2013 Meeting with Hoboken Mayor Dawn Zimmer

Martin recalled being asked to meet with Hoboken Mayor Dawn Zimmer in late February 2013. He had received a request from Christina Renna at the Governor's Office to

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:     File

From:    Gibson, Dunn & Crutcher LLP

Re:     McDermott Interview Memorandum

_____

On March 19, 2014, and March 20, 2014, Matthew McDermott was interviewed by Reed Brodsky, Matthew Benjamin, and/or Alyssa Kuhn of Gibson Dunn. McDermott was not represented by counsel during the interview. All information contained herein was provided by McDermott or as indicated. McDermott has not read or reviewed the memorandum and has not adopted or approved its contents. The interviews began by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that McDermott refrain from discussing the investigation and interview with others. McDermott stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.    Background

In 1990, McDermott graduated from Fairleigh Dickinson University. After graduating, McDermott joined the New Jersey Assembly Republicans Office. In or around 1994 or 1995, McDermott became Communications Director for the New Jersey State Treasurer and then Deputy Commissioner for the New Jersey Department of Labor and Workforce Development. Thereafter, McDermott headed his own government affairs firm, McDermott Public Affairs. In May 2010, McDermott became Chief of Staff in the Department of Labor and Workforce Development. In March 2011, McDermott joined the Office of the Governor as Chief of Staff to the Lieutenant Governor. In or around September 2012, McDermott left his position as Chief of Staff to the Lieutenant Governor and became Director of Appointments. McDermott is a member of the Governor's Senior Staff.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:        McKenna Interview Memorandum

On January 22, 2014, and March 12, 2014, Charlie McKenna was interviewed by
Randy M. Mastro, Debra Wong Yang, Alexander H. Southwell, and/or Sarah L. Kushner of
Gibson Dunn.  On January 22, 2014, McKenna was not represented by counsel.  On March
12, 2014, McKenna was represented by John Azzarello and Matt Whipple of Whipple
Azzarello LLC.  All information contained herein was provided by McKenna or as indicated.
The information in brackets was obtained from publicly-available sources, not from the
interview itself.  McKenna has not read or reviewed the memorandum and has not adopted or
approved its contents.  Southwell began the interview by administering the standard *Upjohn*
warnings per Gibson Dunn protocol, and requesting that McKenna refrain from discussing
the investigation and interview with others.  McKenna stated that he agreed, understood, and
did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the
meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and
impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.        Background

### A.        Role and Responsibilities

McKenna joined Governor Christie's Administration four years ago as the Director of
New Jersey's Office of Homeland Security & Preparedness ("OHSP").  Around the end of
January 2012, McKenna joined the Governor's Office as Chief Counsel.

*[Prior to working in the Administration, McKenna worked at the U.S. Attorney's
Office for the District of New Jersey (the "USAO") for 18 years.  Most recently, he was the
Chief of the Criminal Division at the USAO.  In that capacity, McKenna was responsible for
establishing policy for the Criminal Division, and coordinating with other law enforcement*

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:       Morris Interview Memorandum

On January 23, 2014, David Morris was interviewed by Randy M. Mastro, Reed
Brodsky, Rachel Brook, and Alyssa Kuhn of Gibson Dunn.  Morris was not represented by
counsel during the interview.  All information contained herein was provided by Morris or as
indicated.  Morris has not read or reviewed this memorandum and has not adopted or
approved its contents.  Brodsky began the interview by administering the standard *Upjohn*
warnings per Gibson Dunn protocol, and requesting that Morris refrain from discussing the
investigation and interview with others.  Morris stated that he agreed, understood, and did
not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the
meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and
impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.        Background

In 2010, Morris graduated from Rutgers School of Law-Camden.  Morris was an
associate at the law firm Pepper Hamilton, when his former professor, Kim Ferzan, called
Morris, asked if he was still interested in policy work, and explained that her husband, Marc
Ferzan, had accepted a position as Executive Director of the Governor's Office of Recovery
and Rebuilding ("GORR") to help administer Sandy relief across the State of New Jersey.
Morris interviewed with Marc Ferzan and joined GORR as a Special Advisor.

No one asked Morris about his political affiliation when he joined GORR.  Morris is
an Independent, though recalled voting in a Democratic primary election.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:      Gibson, Dunn & Crutcher LLP

Re:        Mowers Interview Memorandum

---

On February 10, 2014, Matt Mowers was interviewed by Alexander H. Southwell, Avi Weitzman, and Sarah L. Kushner of Gibson Dunn. During the interview, Matt Mowers was represented by Craig Carpenito and Adam Baker of Alston & Bird LLP. All information contained herein was provided by Mowers or as indicated. Mowers has not read or reviewed the memorandum and has not adopted or approved its contents. Weitzman began the interview by administering the standard *Upjohn* warnings per the Gibson Dunn protocol and requesting that Mowers refrain from discussing the investigation and interview with others. Mowers stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.      Background

### A.      Educational and Professional Background

Mowers grew up in New Jersey. He is 24 years old. In October 2011, Mowers graduated from Rutgers University. Mowers explained that he worked during college; thus, he mainly enrolled in night or online classes. In 2009, Mowers said that he worked on a legislative campaign in Bergen County. In 2010, Mowers worked full-time for the Governor's Office in two separate capacities: (1) from approximately January 2010–April 2010, Mowers was an aide for Jim Gilroy, Advance Director; and (2) in or around December 2010, Mowers returned to the Governor's Office as a Regional Director in the Legislative and Intergovernmental Affairs ("IGA") unit, where he remained until April 2013. At IGA, Mowers' region included the following counties: Sussex, Morris, Passaic, Essex, Hudson, and Bergen. In between his two positions in the Office, Mowers worked on a New Jersey State Senate campaign.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

## Memorandum

### PRIVILEGED AND CONFIDENTIAL
### ATTORNEY OPINION WORK PRODUCT

To:         File

From:       Gibson, Dunn & Crutcher LLP

Re:         Moyle Interview Memorandum

---

On February 19, 2014, and March 11, 2014, John Moyle was interviewed by Reed Brodsky, Avi Weitzman, and/or Alyssa Kuhn of Gibson Dunn.  Moyle was not represented by counsel during the interviews.  All information contained herein was provided by Moyle or as indicated.  Moyle has not read or reviewed this memorandum and has not adopted or approved its contents.  Brodsky began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Moyle refrain from discussing the investigation and interview with others.  Moyle stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.      Background

In 1978, Moyle graduated from the New Jersey Institute of Technology with a B.S. in Civil Engineering.  In February 1979, Moyle started working at the New Jersey Department of Environmental Protection ("DEP").  Moyle joined the DEP as an Environmental Engineer Trainee and worked his way up through the ranks to Manager.  Moyle has served as a Manager in the Office of Engineering & Construction for the past ten years, and currently serves as Bureau Chief for the Bureau of Dam Safety and Flood Control.  Moyle supervises approximately 25 individuals in his current role.  Moyle reports to David Rosenblatt, Administrator in the Office of Engineering & Construction.  Moyle said that he is a registered Democrat.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:       File

From:    Gibson Dunn & Crutcher LLP

Re:      Thomas Neff Interview Memorandum

---

On January 29, 2014, Thomas Neff was interviewed by Avi Weitzman, Rachel Brook, and Christian Hudson of Gibson Dunn. Neff was not represented by counsel during the interview. All information contained herein was provided by Neff or as indicated. Neff has not read or reviewed the memorandum and has not adopted or approved its contents. Weitzman began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Neff refrain from discussing the investigation and interview with others. Neff stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.    Background

Neff has been a state employee for almost 22 years. He is currently the Director of the Division of Local Government Services in the New Jersey Department of Community Affairs ("DCA"), and he has worked at the DCA since November 2010. He oversees a staff of 40 people, and their mission is to work with local governors, municipalities, and counties to make sure they are financially stable and complying with state laws. The Division of Local Government Services also affirmatively provides assistance to local governments when they need technical guidance.

Neff is also the Chairman of the Local Finance Board, which reviews proposals by municipalities and counties and issues debt in certain circumstances.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:       File

From:   Gibson, Dunn & Crutcher LLP

Re:       O'Dowd Interview Memorandum

On January 19, 2014, and March 8, 2014, Kevin O'Dowd was interviewed by Randy
M. Mastro, Alexander H. Southwell, Debra Wong Yang, and/or Sarah L. Kushner of Gibson
Dunn. On January 19, 2014, O'Dowd was not represented by counsel. On March 8, 2014,
O'Dowd was represented by Paul H. Zoubek of Montgomery McCracken Walker & Rhoads.
All information contained herein was provided by O'Dowd or as indicated. O'Dowd has not
read or reviewed the memorandum and has not adopted or approved its contents. Southwell
began the interview by administering the standard *Upjohn* warnings per Gibson Dunn
protocol, and requesting that O'Dowd refrain from discussing the investigation and interview
with others. O'Dowd stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the
meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and
impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.       Background

### A.       Role and Responsibilities

O'Dowd joined the Governor's Office as Deputy Chief Counsel the day that
Governor Christie (the "Governor" or "Christie") was inaugurated in January 2010.
Previously, O'Dowd had been at the U.S. Attorney's Office for the District of New Jersey.
On or around January 31, 2012, O'Dowd became the Governor's Chief of Staff, replacing
Richard Bagger, who left the Governor's Office in or around December 2011. During his
first two years in the Governor's Office (from 2010–2012), O'Dowd spent the majority of his
time dealing with the State Legislature and forming relationships with legislators. O'Dowd
eventually reported directly to the Governor on legislative issues, although he kept Christie's
then-Chief Counsel, Jeffrey Chiesa, appropriately informed as well. When O'Dowd became

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:       File

From:     Gibson, Dunn & Crutcher LLP

Re:       Orsen Interview Memorandum

---

On January 23, 2014, January 27, 2014, February 12, 2014, and February 18, 2014, Melissa Orsen was interviewed by Randy M. Mastro, Alexander H. Southwell, Reed Brodsky, Rachel Brook, Sarah L. Kushner, and/or Alyssa Kuhn of Gibson Dunn. Orsen was not represented by counsel during the interview. All information contained herein was provided by Orsen or as indicated. Orsen has not read or reviewed this memorandum and has not adopted or approved its contents. Mastro began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Orsen refrain from discussing the investigation and interview with others. Orsen stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

I.        **Background**

A.        **Professional Background**

In 1997, Orsen graduated from the University of Delaware, and in 2000, she received her J.D. from Widener University School of Law. Shortly after graduating from law school, Orsen, who had always wanted to work for the State, joined the Attorney General's Office for the State of New Jersey.

While at the Attorney General's Office, one of Orsen's main clients was the Department of Community Affairs ("DCA"). Around 2003, Orsen left the Attorney General's Office and became Chief Counsel for the Council on Affordable Housing, a unit within DCA. In 2010, Orsen joined DCA as Commissioner Lori Grifa's Chief of Staff. In March 2012, Orsen joined the Governor's Office as Lieutenant Governor Kimberly

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

## Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:        Reiner Interview Memorandum

On January 28, 2014, David Reiner was interviewed by Reed Brodsky, Rachel Brook, and Christian Hudson of Gibson Dunn. Reiner was not represented by counsel during the interview. All information contained herein was provided by Reiner or as indicated. Reiner has not read or reviewed the memorandum and has not adopted or approved its contents. Brodsky began the interview by administering the standard *Upjohn* warnings per the Gibson Dunn protocol, and requesting that Reiner refrain from discussing the investigation and interview with others. Reiner stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.    Background

In 2003, Reiner graduated from William Patterson University. In 2006, he obtained his juris doctor degree from Rutgers School of Law – Newark. He is a registered Democrat.

After graduating from law school, Reiner was a law clerk for the Honorable Judge Julio Fuentes in the Third Circuit. Reiner was a summer associate at Lowenstein Sandler LLP ("Lowenstein") and returned to Lowenstein after his clerkship from 2007 until January 2010. While at Lowenstein, Reiner worked for former Assistant U.S. Attorney Maureen Ruane. Ruane received a call from Deb Gramiccioni who was heading up the New Jersey Authorities Unit at the time, and Gramiccioni asked Ruane if she knew of anyone interested in working at the Authorities Unit. Reiner interviewed for the job and started working at the Authorities Unit as assistant counsel in January 2010, reporting to Gramiccioni. Reiner worked in this position until March 2012 when Gramiccioni became the Deputy Chief of Staff for Policy and Cabinet Liaison in the Governor's Office, at which point Reiner became

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:        File

From:     Gibson, Dunn & Crutcher LLP

Re:        Renna Interview Memorandum

On Thursday, January 30, 2014, Christina Genovese Renna was interviewed by
Randy M. Mastro, Alexander H. Southwell, Debra Wong Yang and Sarah Vacchiano of
Gibson Dunn.  During the interview, Renna was represented by Henry Klingeman of
Krovatin Klingeman LLC.  All information contained herein was provided by Renna or as
indicated.  The information in brackets was obtained from publicly-available sources, not
from the interview itself.  Renna has not read or reviewed the memorandum and has not
adopted or approved its contents.  Southwell began the interview by administering the
standard *Upjohn* warnings per Gibson Dunn's protocol, and requesting that Renna refrain
from discussing the investigation and interview with others.  Renna stated that she agreed,
understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the
meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and
impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.    Background

[*Renna graduated from St. Joseph's University and received a Master's in Public
Administration from Villanova University.*]

Prior to joining the Governor's Office in 2010, Renna served as a private legislative
aide in District 1 in South New Jersey, then worked in the private sector before spending
three years as a business lobbyist for the Chamber of Commerce of Southern New Jersey, a
501(c)(6) organization.

Renna stated that she kind of fell into her job with the Governor's Office.  She did not
work on the Governor's campaign in 2009, though she did vote for Governor Christie and is
a registered Republican.  Renna was introduced to Bill Stepien in 2009 by Pete Sheridan, a

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:       File

From:    Gibson, Dunn & Crutcher LLP

Re:      Ridley Interview Memorandum

---

On January 23, 2014, March 11, 2014, and March 21, 2014, Evan Ridley was interviewed by Randy M. Mastro, Reed Brodsky, Avi Weitzman, Matthew Benjamin, Rachel Brook, and/or Alyssa Kuhn of Gibson Dunn. On January 23, 2014, Ridley was not represented by counsel. On March 11, 2014 and March 21, 2014, Ridley was represented by Samuel Moulthrop and Zahid Quraishi of Riker Danzig. All information contained herein was provided by Ridley or as indicated. Ridley has not read or reviewed the memorandum and has not adopted or approved its contents. Mastro began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Ridley refrain from discussing the investigation and interview with others. Ridley stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion which reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.    Background

Ridley graduated from the University of Wyoming in 2007. After he graduated, Ridley started working at the Wyoming Republican Party. Ridley worked his way up to Executive Director of the Wyoming Republican Party. Ridley then moved to Washington, D.C. and served as Press Secretary for Wyoming Senator Mike Enzi. Thereafter, he moved to New Jersey to work for the Republican State Committee.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:         File

From:     Gibson, Dunn & Crutcher LLP

Re:        Ryan Interview Memorandum

---

On January 28, 2014 Lisa Ryan was interviewed by Reed Brodsky, Rachel Brook, and Christian Hudson of Gibson Dunn. Ryan was not represented by counsel during the interview. All information contained herein was provided by Ryan or as indicated. Ryan has not read or reviewed the memorandum and has not adopted or approved its contents. Reed began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Ryan refrain from discussing the investigation and interview with others. Ryan stated that she agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.     Background

In 2000, Ryan graduated from the University of Pittsburgh, with a degree in Journalism. She worked as a reporter until December 2008, primarily working for the Asbury Park Press, a Gannett paper. In 2008 the New Jersey Department of Community Affairs ("DCA") hired Ryan as the DCA's Director of Communications. She stayed on in this position after the transition to the Chris Christie Administration. After Sandy, the DCA determined that there was too much work for one position, and split the Director of Communications into two jobs; Ryan then became the Director of Communications for the Sandy Recovery Division. Ryan reports directly to Howard McCoach and Stacy Bonnafons.

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:         File

From:     Gibson, Dunn & Crutcher LLP

Re:        Tintle Interview Memorandum

On February 12, 2014, Kieran Tintle was interviewed by Alexander H. Southwell, Debra Wong Yang, and Sarah L. Kushner of Gibson Dunn. Tintle was not represented by counsel during the interview. All information contained herein was provided by Tintle or as indicated. Tintle has not read or reviewed the memorandum and has not adopted or approved its contents. Yang began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Tintle refrain from discussing the investigation and interview with others. Tintle stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.         Background

### A.        Role and Responsibilities

In or around October 2010, after graduating from Charleston College, Tintle said that he began working for the Governor's Office. Tintle joined the Governor's Office as an Aide in the Appointments Unit; about a year later, he joined the Legislative and Intergovernmental Affairs ("IGA") unit, when Stepien was Deputy Chief of Staff.

Tintle described his different roles within IGA. First, he was a legislative liaison, reporting to Christina Renna and Rebecca Schwarz; at the time, then-Director of IGA, Bridget Kelly, oversaw the Legislative Departmental Relations group. Then, in or around May 2013, Tintle assumed his current position as Director of the Legislative and Departmental Relations group within IGA, and reported directly to Kelly.

### B.        Interaction with Employees in IGA

With regard to his work-related interactions with Kelly, Tintle said that he frequently interacted with Kelly in person and over email. Tintle said that he thought that Kelly was

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

## Memorandum

**PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT**

To:        File

From:    Gibson, Dunn & Crutcher LLP

Re:       Welcher Interview Memorandum

On January 28, 2014, Arif Welcher was interviewed by Reed Brodsky, Rachel Brook, and Christian Hudson of Gibson Dunn. Welcher was not represented by counsel during the interview. All information contained herein was provided by Welcher or as indicated. Welcher has not read or reviewed the memorandum and has not adopted or approved its contents. Brodsky began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Welcher refrain from discussing the investigation and interview with others. Welcher stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.      Background

In 2000, Welcher graduated from the University of North Carolina with a degree in economics. After graduation, he moved to New Jersey and began working as a sales manager for a company called CQI. Welcher then worked in sales positions at different companies.

In 2011, Welcher met Commissioner Richard Constable through his best friend's brother, and Commissioner Constable asked him to be his confidential aide. As Commissioner Constable's aide, Welcher attended all of the Commissioner's meetings, worked with the Commissioner on internal department issues, worked with staff members on personnel issues, and worked on events, speeches and the Commissioner's calendar. A number of these tasks were above and beyond Welcher's job description, so Commissioner Constable promoted Welcher in October 2012, right before Hurricane Sandy hit, to Deputy

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

## Memorandum

PRIVILEGED AND CONFIDENTIAL
ATTORNEY OPINION WORK PRODUCT

To:       File

From:    Gibson, Dunn & Crutcher LLP

Re:      Zimmer Interview Memorandum

---

On March 11, 2014, and March 27, 2014, David Zimmer was interviewed by Avi Weitzman and Alyssa Kuhn of Gibson Dunn. Zimmer was not represented by counsel during the interview. All information contained herein was provided by Zimmer or as indicated. Zimmer has not read or reviewed this memorandum and has not adopted or approved its contents. Weitzman began the interview by administering the standard *Upjohn* warnings per Gibson Dunn protocol, and requesting that Zimmer refrain from discussing the investigation and interview with others. Zimmer stated that he agreed, understood, and did not have any questions.

This memorandum does not contain a verbatim transcript of what was said at the meeting; rather, it is a summary of the discussion that reflects counsel's mental thoughts and impressions and is therefore protected from disclosure by the attorney work product doctrine.

## I.       Background

In 1983, Zimmer graduated from the University of Dayton with a degree in Civil Engineering. In 1984, Zimmer received his MBA from Notre Dame University. Thereafter, Zimmer spent twenty-two years in the private sector in positions at investment banks and commercial banks, working mainly in structured finance. In 2010, Zimmer was approached by Robert Martin, Commissioner of the New Jersey Department of Environmental Protection ("DEP") and a friend of Zimmer's, about overseeing the New Jersey Environmental Infrastructure Trust ("EIT"). In late 2010, Zimmer joined the EIT as Executive Director.

## II.      Role of the New Jersey EIT

Zimmer explained that the EIT issues and services low-interest loans for local government entities and private water purveyors. Every year, the federal government allocates somewhere between $80 and $100 million to New Jersey for the State Revolving Fund ("SRF"), a loan program for water quality infrastructure projects. The SRF is a state-run program with U.S. Environmental Protection Agency ("EPA") oversight. The federal

# EXHIBIT 8

# *Committee Meeting*

of

## NEW JERSEY LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION

*"The testimony of Christina Genovese Renna concerning the committee's investigation into all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey, and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey, to the George Washington Bridge"*

| | |
|---|---|
| **LOCATION:**  Committee Room 11<br>State House Annex<br>Trenton, New Jersey | **DATE:**  May 6, 2014<br>10:00 a.m. |

**MEMBERS OF COMMITTEE PRESENT:**

Senator Loretta Weinberg, Co-Chair
Assemblyman John S. Wisniewski, Co-Chair
Senator Nia H. Gill
Senator Linda R. Greenstein
Senator Kevin J. O'Toole
Assemblywoman Marlene Caride
Assemblyman Louis D. Greenwald
Assemblyman Paul D. Moriarty
Assemblyman Michael Patrick Carroll
Assemblywoman Amy H. Handlin
Assemblywoman Holly T. Schepisi



**ALSO PRESENT:**

| | | |
|---|---|---|
| Charles A. Buono Jr. | Francisco Maldonado | Frank Dominguez |
| Michael R. Molimock | *Senate Majority* | *Senate Republican* |
| *Office of Legislative Services* | Kate McDonnell | Keith Loughlin |
| *Committee Aides* | *Assembly Majority* | *Assembly Republican* |
| | *Committee Aides* | *Committee Aides* |

***Meeting Recorded and Transcribed by***
**The Office of Legislative Services, Public Information Office,
Hearing Unit, State House Annex, PO 068, Trenton, New Jersey**

MS. RENNA:  Yes.

SENATOR WEINBERG:  All right. I'm going to refer to Tab 28, and it's Page 7, Tab 28, of the Gibson Dunn report.  And under Number 2 -- List of Mayors -- it says, "Renna believes--"  Now this is Gibson Dunn's characterization of your interview with them.  "Renna believes Stepien kept track of mayors who were not in favor with IGA." We're not talking about the campaign, now.

MS. RENNA:  Right.

SENATOR WEINBERG:  We're talking about not in favor with IGA.  "But Renna was not privy to that process.  But IGA staff would receive mandatory directives along the lines of, 'Do not rush to return this mayor's phone call.'"  Again, a characterization by Gibson Dunn of your interview: "IGA staff was given mandatory directives."  This was not, "Call me back after 5:00," but a mandatory directive.  "Renna remembered responding"--  Oh, pardon me.  "Renna recalled an IGA staffer asking Renna, 'Can we get a list of hands-off mayors?'  Renna remembered responding, 'You know we won't get it, and it would change daily anyway.'"

So that leads me to believe -- particularly if there was a mandatory directive that changed daily -- that there was some way of informing IGA staff during working hours who was a "hands-off mayor," and that there was a mandatory directive to that effect.  Is that correct?  I mean, I'm reading from Gibson Dunn's characterization of your interview.

MS. RENNA:  So a few things in this.

First, your convoluting in your question -- respectfully -- lists of mayors -- just the 565 municipalities -- which, day-to-day, that was IGA's

job to contact them during the workday, versus potential endorsers. That work happened after 5:00.

SENATOR WEINBERG: So excuse me, Ms. Renna. There was a mandatory directive after 5:00 that said, "These people are hands-off mayors?"

MS. RENNA: *Mandatory directive* were not my words. You notice they are not in quotation marks. Those were Gibson Dunn's words. That was their characterization; they were never words I would use. I would never use *mandatory directives* except in one incident, which we can circle back to. They were not my words.

SENATOR WEINBERG: Did you correct that with Gibson Dunn when you saw that characterization?

MS. RENNA: I didn't see these until it came out publicly.

SENATOR WEINBERG: So you didn't have a chance to correct any of their characterizations of people's interviews?

MS. RENNA: Correct -- or some of their facts. There are minor facts in my interview throughout it that are just-- There are some inaccuracies.

SENATOR WEINBERG: Do you know what other inaccuracies are contained here that you can recall?

MS. RENNA: Sure. For example, there are 60 affected towns, not 16. An important error in the report was this mandatory directives; it has gotten a lot of attention and is upsetting to me because it was not my characterization at all, nor would it be. The phone call I exchanged with Bridget Kelly on December 12: She called me, I called her back. The call dropped mid-conversation; we tried to call each other back. I actually

reached her first, not vice versa.  So little details like that, for example.  But *mandatory directives* is the one that, candidly, was most alarming to me because it's aggressive language and it's not language I would have used.

SENATOR WEINBERG:  Okay.  What did you mean then by -- and this is in direct quotes, or at least--  I'm not sure it's a direct quote from you, but "Staffer asking Renna 'Can we get a list of hands-off mayors?'" And your response, 'You know we won't get it; it would change daily anyway.'"

MS. RENNA:  That was from a text message exchange, which I submitted in my documents to you.  That is a text message between me and a colleague of mine in the Office of Intergovernmental Affairs where we're anecdotally talking about proactively setting up meetings.  Hands-off mayors list.  List?  There's not a formal list.  It's not like there's a secret, hidden list out there that is labeled "hands-off."  It doesn't exist.  This was more conversational in tone.  And what this gets to is -- and circling back to the other line in this portion of the memo, "Do not rush to return this mayor's phone call."  The directive was never, "Don't return this mayor's phone call.  It was proactive.  *Proactive* is a very important word as to what we were instructed.  IGA conducted proactive outreach via phone or via meeting requests all day, every day to local elected officials.  That's what this meant.  Let's pull back on the proactive outreach; however, if a mayor were to call, it doesn't mean don't be responsive.  As a matter of fact, for four years of working in IGA, I have wracked my brain and I can't think of one example when we were not responsive to a mayor who called -- whether or not they were in favor or not in favor with the Administration for

know the dynamics between certain elected officials, certain people, generally speaking. I mean, in his role that was appropriate.

  ASSEMBLYMAN WISNIEWSKI: Did you know that because you had a conversation with Mr. Stepien, or you had a conversation with someone else who told you that?

  MS. RENNA: I worked for Bill Stepien for four years. There were a lot of conversations. So nothing I can specifically recall, but I'm sure conversations happened.

  ASSEMBLYMAN WISNIEWSKI: Just to be fair to you, was it more of an assumption on your part or something that you understood?

  MS. RENNA: Both.

  ASSEMBLYMAN WISNIEWSKI: Okay, thank you.

  In the interview memo, the memo states -- and I'm quoting from the memo Tab 28, Page 7 -- it says, "IGA staff would receive mandatory directives along the lines of 'do not rush to return this mayor's phone call.'" So I just wanted to ask you about the words that are used to describe your interview that say, "Would receive mandatory directives." Can you describe for me how you would receive those mandatory directives?

  MS. RENNA: We did not receive mandatory directives. I'm correcting this language in there.

  ASSEMBLYMAN WISNIEWSKI: Okay. So you're saying that that, a representation of your interview, was incorrect.

  MS. RENNA: Correct.

  ASSEMBLYMAN WISNIEWSKI: Okay, thank you.

# EXHIBIT 9

# *Committee Meeting*

of

## NEW JERSEY LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION

*"The testimony of Kevin O'Dowd, Esq., concerning the committee's investigation into all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey, and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey, to the George Washington Bridge"*

**LOCATION:** Committee Room 11
State House Annex
Trenton, New Jersey

**DATE:** June 9, 2014
10:30 a.m.

## MEMBERS OF COMMITTEE PRESENT:

Senator Loretta Weinberg, Co-Chair
Assemblyman John S. Wisniewski, Co-Chair
Senator Nia H. Gill
Senator Linda R. Greenstein
Senator Kevin J. O'Toole
Assemblywoman Marlene Caride
Assemblyman Louis D. Greenwald
Assemblywoman Valerie Vainieri Huttle
Assemblyman Michael Patrick Carroll
Assemblywoman Amy H. Handlin
Assemblywoman Holly T. Schepisi



## ALSO PRESENT

Philip M. Mersinger
Michael R. Molimock
*Office of Legislative Services*
*Committee Aides*

Francisco Maldonado
*Senate Majority*
Kate McDonnell
*Assembly Majority*
*Committee Aides*

Frank Dominguez
*Senate Republican*
Keith A Loughlin
*Assembly Republican*
*Committee Aides*

*Meeting Recorded and Transcribed by*
**The Office of Legislative Services, Public Information Office,**
**Hearing Unit, State House Annex, PO 068, Trenton, New Jersey**

LORETTA WEINBERG
*Co-Chair*

JOHN S. WISNIEWSKI
*Co-Chair*

**SENATE**

NIA H. GILL
LINDA R. GREENSTEIN
KEVIN J. O'TOOLE

**ASSEMBLY**

MARLENE CARIDE
LOUIS D. GREENWALD
PAUL D. MORIARTY
VALERIE VAINIERI HUTTLE
MICHAEL PATRICK CARROLL
AMY H. HANDLIN
HOLLY T. SCHEPISI



## New Jersey State Legislature
### NEW JERSEY LEGISLATIVE SELECT COMMITTEE
### ON INVESTIGATION
STATE HOUSE ANNEX
PO BOX 068
TRENTON NJ 08625-0068

MICHAEL R. MOLIMOCK
*Office of Legislative Services
Committee Aide*
(609) 847-3855
(609) 292-0561 fax

PHILIP M. MERSINGER
*Office of Legislative Services
Committee Aide*
(609) 847-3840
(609) 292-0561 fax

## COMMITTEE NOTICE

TO:   MEMBERS OF THE NEW JERSEY LEGISLATIVE SELECT COMMITTEE ON INVESTIGATION

FROM:   SENATOR LORETTA WEINBERG, CO-CHAIR AND ASSEMBLYMAN JOHN S. WISNIEWSKI, CO-CHAIR

SUBJECT:   **COMMITTEE MEETING - JUNE 9, 2014**

*The public may address comments and questions to Michael R. Molimock, Philip M. Mersinger Committee Aides, or make bill status and scheduling inquiries to Kimberly Johnson, Secretary, at (609)847-3840, fax (609)292-0561, or e-mail: OLSAideLSI@njleg.org. Written and electronic comments, questions and testimony submitted to the committee by the public, as well as recordings and transcripts, if any, of oral testimony, are government records and will be available to the public upon request.*

**The New Jersey Legislative Select Committee on Investigation will meet on Monday, June 9, 2014 at 10:30 AM in Committee Room 11, 4th Floor, State House Annex, Trenton, New Jersey.**

The committee has subpoenaed Kevin O'Dowd to testify before the committee concerning the committee's investigation into all aspects of the finances, operations, and management of the Port Authority of New York and New Jersey and any other matter raising concerns about abuse of government power or an attempt to conceal an abuse of government power, including, but not limited to, the reassignment of access lanes in Fort Lee, New Jersey to the George Washington Bridge.

Issued 6/4/14

For reasonable accommodation of a disability call the telephone number or fax number above, or TTY for persons with hearing loss 609-777-2744 (toll free in NJ) 800-257-7490. The provision of assistive listening devices requires 24 hours' notice. Real time reporter or sign language interpretation requires 5 days' notice.
For changes in schedule due to snow or other emergencies, call 800-792-8630 (toll-free in NJ) or 609-292-4840.

SENATOR GILL:  Let's do it this way.  I'm going to give you an opportunity to read that paragraph.  And this is from the Gibson Dunn report.  I'm going to ask you if this paragraph is accurate in terms of what you told Dunn and what they reported.

MR. O'DOWD:  I would say this, Senator, if I could.  The line that jumps out at me, is that I would submit to the Committee is not a line that I would adopt, is the line that indicates the -- one, two, three, four -- I guess the fifth line down, beginning with "Kelly."  "Kelly was habitually concerned--"  Am I reading the correct paragraph?

SENATOR GILL:  Yes.

MR. O'DOWD:  So that's--  "Kelly was habitually concerned about how she was perceived by the Governor."   That's not a characterization that I would offer.

SENATOR GILL:  Okay.  And so other than that, "Habitually concerned" -- other than that, the paragraph is, in sum and substance, correct?

MR. O'DOWD:  Yes.

SENATOR GILL:  Okay.  So with that caveat, could you please read the paragraph that begins at "A short--"

MR. O'DOWD:  So page 19, first full paragraph, and I quote, "A short while after this meeting, Kelly came to O'Dowd's office.  Kelly said she was concerned about what the Governor thought of her and asked O'Dowd whether the Governor had lost confidence in her.  She asked O'Dowd if she needed to talk to the Governor.  O'Dowd responded that it was her decision -- a response prompted, in part" -- this is the part I disagree with --

143

and that a lot of this was made up of various moments.  But I would suggest that certainly by mid-November -- November 25 -- that those moments should have come together into some kind of a, "We in the Governor's Office really need to get to the bottom of this."

And as a former prosecutor -- which I know Senator Gill spent a little time on -- are you satisfied, as you sit here today, that the Administration's effort to get to the bottom of this -- as Pat Foye wrote, that "laws were broken" -- are you satisfied that the Administration made every appropriate move to get to the bottom of what took place here?

MR. O'DOWD:  It's hard for me to answer that question with respect to the entire Administration.  But if you focus on me, I interacted directly with Bridget Kelly, asked her direct questions, and did not get what I believe to be a truthful response.  So perhaps I could have done things differently, or better, but I can only focus on myself.

SENATOR WEINBERG:  And I appreciate that, Mr. O'Dowd. I know you work very hard in your job, and you have been open to -- certainly to me on a legislative level whenever I've come to you, which hasn't been often.  But you've always been courteous.

But I'm dealing here with -- or we're dealing here with Mr. Baroni, who was on his way out, whether he knew it or not prior to this, because of whatever unspecified reasons he wasn't performing well.  We're dealing with Mr. Wildstein, who came to Mr. Stepien with whatever -- 20, 50, or 100 crazy ideas every single day.  And then we have Ms. Kelly who worked for you who, according to what came through in the Gibson Dunn report, was a slightly off-balanced woman because she was going through

222

some alleged personal problems.  So that's not my depiction; that's what came through in the Gibson Dunn report about Bridget Kelly.

So you have these three people who were kind of in charge of executing this plan.  And it wasn't until January 8 that anybody discovered that there could be something amiss here.

MR. ZOUBEK:  Could I have a moment?

(attorney/client confer)

MR. O'DOWD:   Well, if I could point to one thing in particular, Senator, as it follows up to maybe a combination of the questions from Senator O'Toole and from Senator Gill.  But where I took exception to that report is in some of the characterization --- the characterization here about Bridget Kelly. The Bridget Kelly who I knew was, again, honest, hard working, forthright -- someone who had been in this building for 20 years and interacted with many of the members on this Committee and the staff.  So characterizations about her -- I know they're not yours--

SENATOR WEINBERG:  Yes; hardly.

MR. O'DOWD:   --are not characterizations that I adopt; and that's not the Bridget Kelly who I interacted with on December 12 and December 13.

SENATOR WEINBERG:   So you would say that you don't agree with the Gibson Dunn characterization of Bridget Kelly?

MR. O'DOWD:  Based on the way you just described here.

SENATOR WEINBERG:   Or with what I said was the Gibson Dunn characterization.

MR. O'DOWD:  Right, and in the particular characterization that was in my report that Senator Gill asked me about -- I directly objected to that.

SENATOR WEINBERG:  Okay.  All right, I appreciate your being here.  It's been a long day, and I thank you for your patience.

MR. O'DOWD:  Thank you, Senator.

SENATOR WEINBERG:  Thank you, Senator Weinberg.

Senator O'Toole.

SENATOR O'TOOLE:  Again, Chair, as of this moment I don't have any additional.  But if you have-- If you raise any issues--  I know you want the last word, and that's the prerogative, but if there are any issues that come up that spur me for additional questions in my second round, I'm entitled to ask them and, obviously, you can finish and have your third round after I'm finished.  But as of this moment, I'm okay. (laughter)

ASSEMBLYMAN WISNIEWSKI:  We'll wait and see, I guess.

SENATOR O'TOOLE:  Okay.

ASSEMBLYMAN WISNIEWSKI:  Mr. O'Dowd, just a couple of follow-up questions on the testimony that you've already given.

You testified that you took Bridget Kelly at her word.

MR. O'DOWD:  Words to that effect, but yes.

ASSEMBLYMAN WISNIEWSKI:  Okay.  Yet when you were asked about Mr. Foye's allegation that laws had been broken, you dismissed his words.

MR. O'DOWD:  I didn't dismiss his words.

ASSEMBLYMAN WISNIEWSKI:  You didn't act upon them.

224

# EXHIBIT 10



**abc NEWS**    HOME | VIDEO | U.S. | WORLD | POLITICS | ENTERTAINMENT | TECH | HEALTH | LIFESTYLE | SHOWS | MORE

Like 6.5m   Follow   SIGN IN   Search

NOW   MEMORIAL DAY 2015   •   CLEVELAND SHOOTING   •   BRYAN PRICE   •   JOHN NASH   •   IRELAND

# EXCLUSIVE: Chris Christie Was Interrogated By Feds Over Bridge Scandal

Jan 9, 2015, 2:04 PM ET

By JOSH MARGOLIN

Like 855   473   881   g+1 17   566 Comments

## HOT RIGHT NOW

1. The Story Behind the Memorial Day Wedding Photo Gone Viral

2. Fighter Jets Scramble Following at Least 6 Threats to Planes

3. Drivers Stranded, Homes Damaged by Houston-Area Flash...

4. Galapagos Island Volcano Erupts, Threatening Fragile...

5. New Orleans Cop Shot Dead in Cruiser



WORLD PREMIERE · MAY 21-JUNE 21

EVER AFTER

CLICK HERE TO BUY TICKETS!

Chris Christie Feels 'Taken Advantage of' in Bridge Scandal

**NEXT VIDEO**
'This Week': 'Bridgegate' Scandal

AUTO START: ON | OFF

**Gov. Chris Christie**, a potential presidential contender, was interrogated recently by federal investigators probing the 2013 lane-closure **scandal** that has threatened his political future, officials confirmed to ABC News.

Christie met with federal prosecutors and **FBI** agents last month during a secret session at the **New Jersey** governor's mansion in Princeton. He agreed to sit down with investigators voluntarily after they offered him a chance to provide his side of the story. Interviewing Christie was one of the final steps in the investigation, which appears to be wrapping up, according to those briefed on it.

**Gov. Chris Christie Cleared - Sort of - in Bridge Scandal**

**Gov. Christie Tells Diane Sawyer His Style Didn't 'Inspire' Bridge Scandal**

**Chris Christie's Bridge Scandal Could Hinge on This Moment**

Anyone being questioned by federal agents is required to tell to the truth or potentially face criminal charges. The governor was accompanied by his personal attorney, Christopher Wray, a former chief of the Justice Department's Criminal Division.

**Christie Cleared--Sort of--in Bridge Scandal**

"**Governor Christie** made clear from day one that he and his administration would fully cooperate with all appropriate inquiries," Christie spokeswoman Maria Comella told ABC News. "That's exactly what he has done and will continue to do, and he is very much looking forward to this matter's conclusion."

## YOU MIGHT ALSO LIKE...



Drew Peterson's Lawyers Appealing    Florida Woman Released In Jailing



Mother Killed in DC Mansion Fire Was    As Seen On Vogue: A "Game-Changing"

US Attorney Paul Fishman, who's leading the investigation, declined to comment on the meeting.

The New Jersey US Attorney's Office and the FBI have spent a year investigating the September 2013 closing of access lanes at the George **Washington** Bridge, which caused unprecedented traffic jams for the better part of a week and crippled Fort Lee, where the GWB is anchored in New Jersey. It has been alleged that the lanes were closed as political payback for the Democratic mayor of Fort Lee after he declined to endorse Christie's gubernatorial re-election in 2013, though Christie has repeatedly denied it.

The GWB lane scandal was simmering for much of late 2013, but only burst into national headlines a year ago Thursday when it was revealed that a deputy chief of staff to Christie, Bridget Kelly, had sent an email that appeared to green-light the closing of two out of three local-access lanes to the span – the most heavily traveled in the country. The bridge is operated by the Port Authority, which is controlled jointly by the governors of New Jersey and New York.

Kelly's words – contained in emails submitted to a state legislature investigative committee – thrust Christie and his inner circle into a crisis first marked by a marathon Statehouse news conference and then two months of dodging questions on the incident. During the meeting with reporters a year ago today, Christie said, "I have nothing to hide. So any questions anybody wants to ask me, they can ask, you know. From law enforcement, you know, anything they want to ask, they can ask. So we have nothing to hide, and this administration has nothing to hide."

Federal authorities offered Christie the opportunity to meet with them months ago, officials familiar with the case explained. The governor was slow to respond originally to the feds, making authorities fear he might be ignoring the overtures. Prosecutors quietly considered whether to ratchet up the pressure by issuing a subpoena for the governor to appear before a federal grand jury, but then Christie's camp made arrangements for the governor to meet with them after **Election Day** and at one of the most secluded places in New Jersey, the ornate executive mansion – known as Drumthwacket. Little of the 11-acre property is visible from outside the gates and the estate is secured by the NJ State Police. By contrast, the federal grand jury convened to investigate the GWB scandal meets weekly at a busy courthouse in downtown Newark.

Christie's session with the feds was scheduled to last as long as the feds wanted. It went on for far more than two hours.

The meeting was termed "professional, collegial and courteous," by someone familiar with what went on.

Being interviewed by the authorities was yet another ironic twist for Christie, who has gone from being a feared federal prosecutor famous for tormenting governors to being a governor himself probed by the feds. Little more than 10 years ago, while Christie was New Jersey's US attorney, he dispatched federal agents to the governor's mansion to interview then-Gov. **Jim McGreevey**, who had just resigned, saying he was being blackmailed by a former aide. This time, Christie was the one being questioned as prosecutors determine what happened at the GWB, who ordered it, whether any federal laws were broken and, if so, by whom.

Once Kelly's email was revealed, Christie fired her instantly and cut ties with his former campaign manager, Bill Stepien, who had been widely viewed as the man who would run a Christie presidential campaign.

The governor also retained an outside law firm to investigate what came to be known as "Bridge-gate." That effort, led by former New York City Deputy Mayor Randy Mastro, cleared the governor. The day Mastro's report was released, Christie met with **Diane Sawyer** of ABC News and, in an exclusive interview, said he "did nothing to create the environment" that prompted his former top aides to shut down the lanes.

Though the Mastro report exonerated Christie, it had no effect on the other investigations spawned by GWB scandal, the most wide-ranging of which is the one being led by Fishman. As part of that probe, a federal grand jury spent weeks taking testimony from people on all sides of the case. In April, ABC News reported exclusively that longtime Christie press secretary Mike Drewniak appeared before the grand jury – as a "fact witness" -- for more than two hours to explain what he knows about the scandal.

Christie and his aides are also facing continued scrutiny from a series of other probes being conducted by the Manhattan DA's office, the legislature and the Port Authority Inspector General. In addition, the results of the FBI probe could be turned over to state prosecutors in the event they want to file their own charges in connection with the lane closing.

 855     173    881     17    |    566 Comments

## PROMOTED STORIES                                    MORE FROM ABC NEWS

Recommended by

## PHOTO GALLERIES



View: This Week in Pictures
International

• • • • •

## SEE IT, SHARE IT



Galapagos Island Volcano Erupts, Threatening Fragile Ecosystem

*Diego Paredes/AP Photo*

Powerful Waterspout Hurls Kids Bouncy Castle Through the Air

*Brandon Burchett*

Flash Floods Force Thousands in Texas to Flee

*Tom Harvey/AP Photo*

What to Watch on TV This Summer

*ABC/abc/HBO*

How Couple Missing for 2 Weeks Tried to Survive

*San Diego County Sheriff's Department*

This Day at the Beach Doesn't Look Like Any Other

*Courtesy Antoine Rose*

Ben Stiller Pays Tribute to His Late Mother Anne Meara

*Elisabetta A. Villa/Getty Images*