# CRITCHLEY, KINUM & VAZQUEZ, LLC
ATTORNEYS AT LAW
75 LIVINGSTON AVENUE
ROSELAND, NEW JERSEY 07068

MICHAEL CRITCHLEY
MICHAEL CRITCHLEY, JR.
CHRISTOPHER W. KINUM
JOHN MICHAEL VAZQUEZ

EDMUND DENOIA
CHRISTOPHER L. FOX

(973) 422-9200

FAX: (973) 422-9700
web site: www.critchleylaw.com

June 9, 2015

**Via ECF**

Honorable Susan D. Wigenton
United States District Judge
Martin Luther King Building &
   U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

      Re:   *United States v. William E. Baroni, Jr. and Bridget Anne Kelly*
            Crim. No. 15-193 (SDW)

Dear Judge Wigenton:

    I am writing in response to the letter delivered to Your Honor on June 8, 2015, by Randy Mastro, Esq., on behalf of the Office of the Governor and/or Gibson Dunn. As Your Honor is aware, neither the Office of the Governor nor Gibson Dunn are parties to this matter and have no standing to intervene in the Court's consideration of Ms. Kelly's request for a Rule 17(c) subpoena. As such, Your Honor respectfully should simply ignore Mr. Mastro's improper and premature attempt to quash a subpoena that has not been issued.

    Suffice to say that Ms. Kelly will respond at length to the numerous misstatements and glaring omissions contained in Mr. Mastro's letter in the event Your Honor issues the Rule 17(c) subpoena and the Office of the Governor and/or Gibson Dunn move to quash the subpoena. However, it is important to note that Mr. Mastro's letter makes clear that Gibson Dunn electronically created interview notes during the course of an active Grand Jury investigation and now those notes purportedly no longer exist. Given that the interview notes were created electronically, it is still far from clear whether the notes exist or, at a minimum, are recoverable. Indeed, Mr. Mastro states "[u]nder our protocol and practice for *this* investigation,[1] witness

---

[1] Interestingly, the "protocol and practice" employed by Gibson Dunn in "this" investigation is contrary to the "protocol and practice" utilized by Gibson Dunn in the *Gruss* matter (which Ms. Kelly cited in her May 27, 2015 submission), which was decided two months before Gibson Dunn was retained to represent the Office of the

*Hon. Susan D. Wigenton, U.S.D.J.*
*June 9, 2015*
*Page 2*

interviews were summarized electronically by one attorney while the interviews were being conducted and then edited electronically into a single, final version." Mastro Letter at 5 (emphasis added). Presumably, the interview notes electronically created during the actual interviews, particularly interview notes of witnesses interviewed over multiple days, were saved before they were electronically edited and converted into the interview summaries, and therefore still exist or are recoverable.

Additionally, Mr. Mastro's statement that I am "seeking imaginary materials" that "I admit[] to knowing do not exist" is completely wrong. Until Mr. Mastro's June 8, 2015, letter stating that Gibson Dunn created electronic interview notes and that those notes no longer exist, it was far from clear that Gibson Dunn did not retain interview notes in any form, contrary to its contractual obligation to the State of New Jersey to retain all its work product for seven years and its legal and professional obligations not to destroy or alter information relevant to an ongoing Grand Jury investigation.

Mr. Mastro also cites to New Jersey Assemblyman John Wisniewski who allegedly "announced" that it was "his understanding" that there were "*no recordings or transcripts* from the Gibson Dunn interviews." Mastro Letter at 4 (emphasis added). Of course, Mr. Wisniewski's "announcement" is silent as to the existence or non-existence of electronic interview notes that we have now learned were created but allegedly no longer exist. Similarly, Mr. Mastro states "it has been a matter of public record since the spring of last year when we issued our report summarizing the findings of our investigation that we did not *transcribe* or *record* our interviews." Mastro Letter at 1 (emphasis added). Again, Mr. Mastro's claim concerning what was a matter of public record makes no mention of the electronic interview notes that were created but allegedly no longer exist. Mr. Mastro's letter also conveniently fails to mention that the United States Attorney's Office ("USAO"), with whom Gibson Dunn communicated concerning the status of its interview notes, does not object to the issuance of a Rule 17(c) subpoena, strongly suggesting that the USAO is unsure of what is in Gibson Dunn's possession.

Separately, Mr. Mastro's suggestion that our request for a Rule 17(c) subpoena is somehow a diversionary tactic to distract attention from my client's supposed misconduct, which he self-servingly claims was detailed in his report and confirmed by the present Indictment, could not be farther from the truth. In fact, the crux of the present Indictment is that Ms. Kelly and others engaged in a conspiracy to punish Fort Lee Mayor Mark Sokolich for his failure to endorse Governor Christie's 2013 re-election. However, Mr. Mastro stated in his press conference announcing the release of his report that "the evidence does not establish that that ulterior motive was to target Mayor Sokolich because he did not endorse Governor Christie. In fact there is *substantial contrary evidence* . . . ." Randy Mastro Press Conference at 5:20–5:35 (March 27, 2014) (emphasis added) *available at* http://www.c-span.org/video/?318568-1/george-washington-bridge-closure-review-report. Similarly, Mr. Mastro's report states "the lane

---

Governor and in which Gibson Dunn was ordered to produce the attorney notes of witness interviews that it actually maintained in that case. *See Gruss v. Zwirn*, 296 F.R.D. 224 (S.D.N.Y.).

*Hon. Susan D. Wigenton, U.S.D.J.*
*June 9, 2015*
*Page 3*

realignment, based on all the available evidence, does not appear to have been based on Mayor Sokolich's decision not to endorse the Governor." *See* Mastro Report at 282 n.91 (attached). As such, Mr. Mastro's conclusions completely undercut the core theory of the government's case.

The interview notes, therefore, are highly relevant and admissible to, among other things, rebut the foundation of the government's case that the lane realignment was the result of Mayor Sokolich's decision not to endorse the Governor. Indeed, contemporaneous witness statements obtained by Gibson Dunn relating to allegations in the indictment are by definition highly relevant.

                                Respectfully submitted,

                                s/ Michael Critchley
                                MICHAEL CRITCHLEY

MC:km

cc:    Vikas Khanna, A.U.S.A. (Via ECF)
        Lee Cortes, A.U.S.A (Via ECF)
        Michael Baldassare, Esq. (Via ECF)
        Randy Mastro, Esq. (via e-mail)
        Alexander Southwell (via e-mail)

# REPORT OF GIBSON, DUNN & CRUTCHER LLP
## CONCERNING ITS INVESTIGATION ON BEHALF OF
## THE OFFICE OF THE GOVERNOR OF NEW JERSEY INTO ALLEGATIONS
## REGARDING THE GEORGE WASHINGTON BRIDGE LANE REALIGNMENT
## AND SUPERSTORM SANDY AID TO THE CITY OF HOBOKEN

**March 26, 2014**

www.GDCReport.com

[84] *See* Ex. 51 (Kate Zernicke & March Santora, *'Very Sad' Chris Christie Extends Apology in Bridge Scandal*, The New York Times (Jan. 9, 2014) *available at* http://www.nytimes.com/2014/01/10/nyregion/christie-controversy-bridge-lane-closings.html).

[85] Ex. 52 (2014.01.09 9:57 AM Text Message from Kelly to Renna).

[86] *See* Ex. 53 (David W. Chen & William K. Rashbaum, *Former Aide to Christie Invokes Fifth Amendment Right*, The New York Times (Feb. 3, 2014) *available at* http://www.nytimes.com/2014/02/04/nyregion/former-aide-to-christie-invokes-fifth-amendment.html).

[87] *See S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994) ("We have held that 'reliance on the Fifth Amendment in civil cases may give rise to an adverse inference against the party claiming its benefits.'" (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976))); *In re Grand Jury*, 286 F. Supp. 153, 160-61 (3d Cir. 2002).

[88] *See* Ex. 53 (David W. Chen & William K. Rashbaum, *Former Aide to Christie Invokes Fifth Amendment Right*, The New York Times (Feb. 3, 2014) *available at* http://www.nytimes.com/2014/02/04/nyregion/former-aide-to-christie-invokes-fifth-amendment.html).

[89] In seeking indemnification for attorneys' fees, Wildstein's lawyer wrote in a January 31, 2014 letter to the Port Authority that "evidence exists" of the Governor knowing of this situation during the period the lanes were closed. Ex. 54 (2014.01.31 Letter from Zegas to Buchbinder). This was likely a reference to a 9/11 Memorial event at which Port Authority officials, including Wildstein, were together with the Governor on Wednesday, September 11, 2013. Published photographs depicted them all together that day. Ex. 55 (*Sept. 11th Memorial Service*, The Herald Record (Sept. 11, 2013), *available at* http://www.recordonline.com/apps/pbcs.dll/gallery?Site=TH&Date=20130911&Category=NEWS&ArtNo=911009999&Ref=PH&Presentation=desktop). It will apparently be Wildstein's contention—as he alleged in early December 2013 to Drewniak—that he mentioned the traffic issue to the Governor on that occasion. Whatever brief exchange they had occurred in a public setting where they were surrounded by many, including other Port Authority officials, the Governor's wife, and a steady stream of spectators requesting photographs and handshakes with the Governor. Not surprisingly, the Governor has no recollection of such an exchange.

[90] *See* Ex. 51 (Kate Zernicke and March Santora, *'Very Sad' Chris Christie Extends Apology in Bridge Scandal*, The New York Times (Jan. 9, 2014) *available at* http://www.nytimes.com/2014/01/10/nyregion/christie-controversy-bridge-lane-closings.html).

[91] The source of Wildstein or Kelly's personal or political animus toward Mayor Sokolich is not clear from the evidence we have reviewed. As previously explained, Wildstein himself seemed to have had a personal or professional interest in studying these dedicated Fort Lee toll lanes as a policy matter. Moreover, the lane realignment, based on all the available evidence, does not appear to have been based on Mayor Sokolich's decision not to endorse the Governor.

[92] Ex. 56 (State of the Union with Candy Crowley, *Interview with Mayor Zimmer*, CNN (Jan. 19, 2014) *available at* http://transcripts.cnn.com/TRANSCRIPTS/1401/19/sotu.01.html) at 5.

[93] Ex. 57 (Anderson Cooper 360 Degrees, *New Jersey Payback Politics?; Interview with Mayor Dawn Zimmer*, CNN (Jan. 20, 2014) *available at* http://edition.cnn.com/TRANSCRIPTS/1401/20/acd.01.html) at 2.

[94] Ex. 58 (Collecting for reference the images of the journal by Mayor Zimmer in the order in which they appear in the article, *Christie camp held Sandy relief money hostage, mayor alleges*, MSNBC (Jan. 18, 2014) (embedded version available at http://www.scribd.com/document_downloads/200600851?extension=pdf&from=embed&source=embed) ("MSNBC Zimmer Journal")) at 8.

[95] *See* Ex. 59 (Collecting for reference the images of the journal by Mayor Zimmer in the order in which they appear in the article, Erin Durkin, *New Jersey mayor's diary: Chris Christie held Hurricane Sandy aid 'hostage'*, New York Daily News (Jan. 20, 2014) *available at* http://www.nydailynews.com/news/politics/n-mayor-christie-held-sandy-aid-hostage-article-1.1584658?print ("Daily News Zimmer Journal")) at 2.

[96] Ex. 60 (Chris Frates, *First on CNN: Mayor behind Christie allegations full of contradictions*, CNN (Feb. 3, 2014) *available at* http://www.cnn.com/2014/02/03/politics/christie-hoboken-mayor-zimmer-accusations/).